DINES AND ENGLISH, L.L.C.

ATTORNEYS AT LAW

685 VAN HOUTEN AVENUE

CLIFTON, NEW JERSEY 07013

———

973 - 778-7575

FACSIMILE

973 - 778-7633

PATRICK C. ENGLISH

———

AARON DINES

(1923-2002)

———

JASON M. SANTARCANGELO
ALSO ADMITTED IN N.Y.

November 7, 2006

Honorable Harold Baer, Jr., USDJ
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street/Chambers 2230
New York, New York 10007-1312

Re: **New Jersey Sports Productions, Inc.**
**v. Panos Eliades, et al.**
**Civil Action No.: 06 CV 1509 (HB)**

Dear Judge Baer:

We have tried to be courteous, but we respectfully object to the letter sent sometime after 8 p.m. last night by Mr. Levites. We have consented to extensions after extensions, but there is a point at which this must stop.

We received a call from Your Chambers with a request that we quickly respond to a letter filed by Mr. Levites yesterday. We filed our response last night. However, well after we had left our office counsel for Banner sent via fax (but did not electronically file) what purports to be its response to our motion. Counsel did not bother to ask our consent to the late response and obviously did not ask the Court. There is little chance that a fax sent after 8:00 p.m. would be seen until today and it was not.

The Federal Rules of Civil Procedure provide for liberal pretrial discovery. In the instant matter, each interrogatory and document demand have been reasonably calculated in accord with Rule 26. Rule 26(b)(1) defines the scope of discovery in broad terms:

> **Parties may obtain discovery regarding any matter, not privileged, that is**
> **relevant to the claim or defense of any party, including the existence,**
> **description, nature, custody, condition, and location of any books,**
> **documents, or other tangible things and the identity and location of persons**
> **having knowledge of any discoverable matter. For good cause, the court may**
> **order discovery of any matter relevant to the subject matter involved in the**

DINES AND ENGLISH, L.L.C.

ATTORNEYS AT LAW

The Honorable Harold Baer, Jr., U.S.M.J.
November 7, 2006
Page 2

> **action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.** Fed.R.Civ.P. 26

The liberal standard is supported by the Southern District of New York and Second Circuit. Just a few months ago in, In re Flag Telecom Holdings, Ltd. Securities Litigation, 236 F.R.D. 177 (S.D.N.Y. 2006), Judge Connor stated:

> "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party .... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). "Relevance" is to be interpreted broadly "and will include 'any matter that bears on, or that reasonably could lead to other [information] that could bear on, any issue that is or may be in the case.'" Sherwin-Williams Co. v. Spitzer, No. 04 CV 185, 2005 WL 2128938, at *11 (N.D.N.Y. Aug. 24, 2005) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)); see Hickman v. Taylor, 329 U.S. 495, 501 (1947). Discovery is not limited to the issues raised in the pleadings. Oppenheimer Fund, 437 U.S. at 351. Indeed many factual issues may arise during discovery that may not necessarily be related to the merits of the case. Id. **"Discovery itself is designed to help define and clarify the issues."** Id. at 183. **(emphasis supplied).**

The Second Circuit has continually supported the broad, liberal encompassing findings of the Oppenheimer Fund Court. in supporting the Oppenheimer Fund Court, the Maresco v. Evans Chemetics, Div. of W.R. Grace & Co., 964 F.2d. 106 (2nd Cir. 1992) Court stated, "the scope of discovery under Fed.R.Civ.P 26(b) is very broad." Maresco, 964 F.2d. at 114. A year earlier the Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357 (2d. Cir. 1991) stated "this obviously broad rule [26(b)(1)] is liberally construed." Id. at 1367.

Banner has only objected to five interrogatories in its responsive papers to the Court. Those interrogatory, numbers 21 through 23, deal with the limited issue of Mr. Pelullo's character. Interrogatory numbers 8 and 13 deal with privilege. Banner does not contest the other seven interrogatories (Nos. 1, 2, 3, 4, 10, 14, 15), or 17 document demands (Nos. 10, 11, 12, 13, 14, 17, 18 and from the supplemental demand Nos. 1-10) at issue in this motion.

Rather than respond to the direct inquires made in the original pleadings, Mr. Levites focuses his attention to issues of Mr. Arthur Pelullo's character by painting in broad strokes why Mr. Pelullo's character is not relevant to a fraud case. Mr. Pelullo's character is relevant. He is the principal of Banner, one of two parties whom Main Events has alleged committed a fraud on

**DINES AND ENGLISH, L.L.C.**

ATTORNEYS AT LAW

The Honorable Harold Baer, Jr., U.S.M.J.
November 7, 2006
Page 3

not only Main Events but this Court. At its lowest common denominator, this case is about fraud. Character issues are highly relevant and must not be ignored. Credibility is extremely important and the interrogatories and document demands have been designed to assess not only credibility but character. According to the Rules, Banner is required to provide responsive answers.

This matter is neither new nor novel. It first brought to counsel's attention in our July 18, 2006 letter referring to the June 30 conference call where outstanding discovery issues were discussed. (*See* Exhibit D of Jason M. Santarcangelo Certification submitted in support of this motion). Mr. Levites did not take issue with the characterization at the time and quite frankly we are surprised that he is taking issue with them now.

Interrogatories numbers 21 through 23 address the character of Mr. Pelullo. These questions are highly relevant and clearly calculated to lead to admissible evidence. Further, we are not simply fishing. There have been numerous citations to Mr. Pelullo's connection to the mafia. For example, in Leslie Bonano, Inc. v. State of Louisiana, 2001 CA 1912 (LA Appeal 2002) (attached as exhibit A) the Court stated that the decision to deny Leslie Bonano, Inc. a non-gaming supplier license on grounds that Bonano:

> "created or fostered an appearance of impropriety" through associations with persons whose present or past activities, habits, criminal record, or reputation "threatens the public interest in the integrity of gaming" in Contravention of Section 7(C)(1)(n) of the [Tribal State Class III] Compact. The decision was based on Mr. Bonano's prior associations with **Arthur Pelullo, an organized-crime-family associate**. Id. at p. 2 (**emphasis added**)

The interrogatories related to character are designed to seek out the truth in a fraud case. Under Rule 26, Banner is required to give an answer, yet has failed to do. Furthermore, in the New Jersey State Commission of Investigation stated in an October 1992 report related to Organized Crime in bars:

> On another occasion, Leonetti met with Matthews [(Mayor of Atlantic City)], Shapiro and a Scarfo Family Associate named Arthur "Artie" Pelullo. Leonetti arranged for the meeting because he wanted Pelullo to apologize to Matthews for threatening him. During 1982 or 1983, when the Scarfo Family was involved with Matthews to help him get some type of license so that his limousine company could operate in Atlantic City. When Pelullo was having trouble getting the license, he threatened to kill Matthews, who contracted Leonetti for help. Leonetti set up a meeting at Shapiro's condominium to settle the matter and made Pelullo apologize to Matthews. New Jersey State Commission of Investigation

DINES AND ENGLISH, L.L.C.
ATTORNEYS AT LAW

The Honorable Harold Baer, Jr., U.S.M.J.
November 7, 2006
Page 4

Report 1992, found at http://www.state.nj.us/sci/pdf/ocbars2.pdf.    (relevant portion is attached as Exhibit B).

Mr. Pelullo's conduct goes directly to his character.  Banner is required to answer interrogatories number 21 through 23 as they relate to the character of the Arthur Pelullo, principal of Banner.  The above references to organized crime have roots in governmental findings.

This case is about fraud.  Character is highly relevant.  This is not a fishing expedition by Main Events.   Rather interrogatories numbers 21 through 23 are directly and reasonably calculated to lead to the discovery of admissible evidence.  The above statements linking Mr. Pelullo to the mafia demonstrate why questions about character have been posed.  Banner must provide responsive answers.

Mr. Levites further asserts that a privilege log should only be given in response to documents.  This statement is wrong.  This Court requires all that assertions of privilege be supported a by a log according to Local Civil Rule 26.2 which states in relevant part that

**(a) Where a claim of privilege is asserted in objecting to any means of discovery or disclosure, including but not limited to a deposition, and an answer is not provided on the basis of such assertion**

**(1) The attorney asserting the privilege shall identify the nature of the privilege (including work product) which is being claimed and, if the privilege is governed by state law, indicate the state's privilege rule being invoked; and**

**(2) The following information shall be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information:**

**(A) For documents: (i) the type of document, *e.g.*, letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other;**

**(B) For oral communications: (i) the name of the person making the communication and the names of persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communication; (ii) the date and place of communication; and (iii) the general subject matter of the communication.**

DINES AND ENGLISH, L.L.C.

ATTORNEYS AT LAW

The Honorable Harold Baer, Jr., U.S.M.J.
November 7, 2006
Page 5

[Source: Former Local Civil Rule 46(e)(2) (Southern District Only) Local Civil Rule 26.2.

The Local Requires that a privilege log be produced. Interrogatories are not exempt from privilege logs. Therefore, Banner must either produce an answer or produce a privilege log to all questions, not just interrogatories 8 and 13, to which a privilege is claimed.

Banner has willfully chosen to challenge only five interrogatories in its latest response to the Court. Main Events has demonstrated that answers are required for all five contested interrogatories. Additionally, through its original letter memorandum, incorporated by reference, Banner is required to provide responsive answers and/or documents as outlined in the motion. Choosing to respond to only a few contested issues does not relieve Banner of its obligation to provide responsive answers to all of Main Events' discovery requests.

It is respectfully requested that the Court grant the motion to compel discovery in accordance with Rule 37 of the Federal Rules of Civil Procedure, requiring Banner to provide Main Events with the requested answers to all the interrogatories and documents.

Respectfully submitted,

DINES AND ENGLISH, L.L.C.

BY: _____
    JASON M. SANTARCANGELO

BY: _____
    PATRICK C. ENGLISH

CC. All Counsel

# **EXHIBIT A**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2001 CA 1912

LESLIE BONANO, INC.

VERSUS

STATE OF LOUISIANA, THROUGH THE DEPARTMENT
OF PUBLIC SAFETY AND CORRECTIONS, LOUISIANA
GAMING CONTROL BOARD AND STATE OF LOUISIANA,
THROUGH THE DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONS INDIAN CASINO GAMING DIVISION

**Judgment Rendered:    June 21, 2002.**

Appealed from the 19th Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Suit Number 477, 687

Honorable Curtis A. Calloway, Judge

| | |
|---|---|
| Michael Calogero<br>Metairie, Louisiana<br>and<br>B. Kyle Kershaw<br>Baton Rouge, Louisiana | Counsel for Plaintiff/Appellant,<br>Leslie Bonano, Inc. |
| Michael Daniels<br>Baton Rouge, Louisiana | Counsel for Defendant/Appellee,<br>State of Louisiana, through the Dep't<br>of Public Safety & Corrections, La. State<br>Police, La. Gaming Control Bd.,<br>Indian Casino Gaming Division |
| L. Rand Dennis<br>Baton Rouge, Louisiana | Counsel for Defendants/Appellees,<br>Louisiana Gaming Control Board and<br>State of Louisiana, through the Dep't<br>of Public Safety & Corrections, La. State<br>Police, La. Gaming Control Bd.,<br>Indian Casino Gaming Division |

**BEFORE: CARTER, C.J., LANIER AND CLAIBORNE,[1] JJ.**

---

[1]    Honorable Walter I. Lanier, Jr., Judge (retired) and Honorable Ian W. Claiborne, Judge (retired) are serving *Pro Tempore* by special order of the Louisiana Supreme Court.

**CARTER, C.J.**

The Louisiana State Police, Indian Casino Gaming Division (Division), denied the application of Leslie Bonano, Inc. (Bonano) to obtain a non-gaming supplier license to promote boxing matches at Indian gaming casinos. The Division denied the license on the basis that the corporation's sole owner, Leslie Bonano (Mr. Bonano), failed to disclose five prior businesses he worked for on the application. The Division found that failure to disclose a material fact to the Division is grounds for denial pursuant to the Tribal/State Class III Compact, Section 7(C)(1)(d) & (e) as entered into by the State and Chitimacha Tribe pursuant to the Indian Gaming Regulatory Act of 1988 (25 U.S.C. § 2701) (Compact). Specifically, the Division found that Mr. Bonano failed to list his prior association with Boxercise of America, Jefferson Sports Commission, Read Seafood, Boxing on the Ice, and Kushner Promotions.

The Division also denied the application because they found that Mr. Bonano "created or fostered an appearance of impropriety" through associations with persons whose present or past activities, habits, criminal record, or reputation "threatens the public interest in the integrity of gaming" in contravention of Section 7(C)(1)(n) of the Compact. The decision was based on Mr. Bonano's prior associations with Arthur Pelullo, an organized-crime-family associate; Frank Caracci, a reputed New Orleans mob figure and convicted felon; Robert Guidry, who pled guilty to a federal felony related to his ownership of a Louisiana licensed riverboat; and Mike Stuebben, who has a history of felony convictions for gambling offenses.

The parties mutually agreed to review of the decision by the Louisiana Gaming Control Board (Board). The hearing officer reversed the prior decision and ordered that the Division issue state certification to Bonano as a non-gaming

supplier. The hearing officer found Mr. Bonano did not intentionally fail to list the five businesses; his involvement with the businesses does not threaten the public interest in the integrity of gaming; his associations with "unsavory characters" did not threaten the public interest in the integrity of gaming; and the Division did not carry its burden of proving that Mr. Bonano should be disqualified as a non-gaming supplier.

The Division appealed the hearing officer's decision to the Louisiana Gaming Control Board (Board) pursuant to LSA-R.S. 27:25E. The Board considered this matter in open meeting and reversed the decision of the hearing officer, denying a non-gaming supplier's license to Bonano. Bonano's motion for rehearing was also denied.

Bonano flied a Petition for Judicial Review in the Nineteenth Judicial District Court, which was denied, thus dismissing the case. Bonano appeals.

## STANDARD OF REVIEW

The Board has regulatory authority, control and jurisdiction, including investigation and licensing, over all aspects of gaming activities and operations as authorized pursuant to the Louisiana Gaming Control Law and the Louisiana Administrative Procedure Act. See LSA-R.S. 27:15B(1); LSA-R.S. 27:24A(1); and LSA-R.S. 49:950, et seq. Any person adversely affected by an action or decision of the Board may appeal to the Nineteenth Judicial District Court in accordance with the provisions of the Administrative Procedure Act (APA). See LSA-R.S. 27:26; and LSA-R.S. 27:310E.

The APA specifies that judicial review shall be confined to the record, as developed in the administrative proceedings. LSA-R.S. 49:964F. The district court may affirm or remand the agency decision. However, reversal or modification of the agency decision is restricted to instances in which substantial

3

rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the agency's statutory authority; (3) made upon unlawful procedure; (4) affected by other error of law; (5) arbitrary, capricious, or an abuse of discretion; or (6) not supported and sustainable by a preponderance of evidence as determined by the reviewing court, with due regard to the agency's determination of credibility issues where it had the opportunity to observe first-hand the demeanor of the witnesses.    LSA-R.S. 49:964G.    An aggrieved party may obtain a review of any final judgment of the district court by appeal to the appropriate circuit court of appeal. LSA-R.S. 49:965.

On legal issues, the reviewing court gives no special weight to the findings of the administrative agency, but conducts a de novo review of questions of law and renders judgment on the record. **Louisiana Automotive Financial Servs., Inc. v. Department of Econ. Dev.,** 98-0981, p. 4 (La.App. 1st Cir. 5/14/99), 743 So.2d 217, 219. We are free to make our own determinations of the correct legal meaning of the appropriate statutes and render judgment on the record. **Southlake Dev. Co. v. Secretary of Dept. of Revenue & Taxation,** 98-2158, p. 3 (La.App. 1st Cir. 11/5/99), 745 So.2d 203, 205, writ denied, 99-3405 (La.2/4/00), 754 So.2d 235. Appellate review of questions of law is simply review of whether the lower court was legally correct. **Premier Games, Inc. v. State Dept. of Public Safety & Corrections,** 99-0624, p. 3 (La.App. 1st Cir. 5/12/00), 761 So.2d 707, 710.

## LAW AND ANALYSIS

This dispute revolves around the interpretation of Section 7(C) of the Tribal/State Compact between the Chitimacha Tribe and the State of Louisiana that provides for the suitability of an applicant for state certification. Section 7 states in pertinent part:

(A) Prior to providing any functions or services, all persons and entities shall be licensed by the **Chitimacha Tribe of Louisiana** and be certified by the **State of Louisiana**.

. . . .

(C)(1) The **State of Louisiana** may revoke, suspend, or deny a State certification for any reason it deems to be in the public interest. These reasons include, but are not limited to, when an applicant for or holder of State certification:

. . . .

    (d) Fails to disclose or makes a misrepresentation of a material fact to the **Chitimacha Tribe of Louisiana** or the **State of Louisiana**.

    (e) Fails to prove their qualifications in accordance with the provisions of this Tribal-State Compact.

. . . .

    (n) Has created or fostered an appearance of impropriety, by virtue of their present or past activities, criminal record, reputation, habits, or associations, or has otherwise engendered a situation which threatens the public interest in the integrity of gaming, the effectiveness of gaming regulation and control, or in fair and lawful practices, methods, and financial arrangements in gaming.

The Board reversed the hearing officer's decision, thus denying Mr. Bonano's application for a non-gaming license, on the grounds that the Division's initial denial was proper as the application and subsequent investigation of Mr. Bonano justified denial under Section 7(C)(1)(d) and (n). We shall review this decision to determine if the decision and subsequent affirmation by the district court was proper.

The state can deny certification for any reason it deems to be in the public interest. Failure to disclose a material fact to the Tribe in the application is specifically set out in Section 7(C)(1)(d) of the Compact as a reason for denying licensure. It is undisputed that Mr. Bonano failed to list at least five businesses with which he was associated on his application, two of which (Boxing on the Ice

and Kushner Promotions) he was associated with only seven months prior to filing his application. The Board also found that Mr. Bonano had failed to disclose his association with Banner Productions, where he worked as a boxing matchmaker and promoter in 1998 and from whom he received over half his income for that year. These associations, all three in the field of boxing and occurring within a year of the application, are material facts that should have been disclosed on the application.

The hearing officer found that these omissions were unintentional. The Compact does not require that the failure to disclose be intentional. As such, we find that the Board did not err in finding that Mr. Bonano's failure to disclose material facts are grounds for denial of the application. Thus, the district court was justified in dismissing review on this issue.

The Board also found that Section 7(C)(1)(n) provides additional grounds for denial of the application. Under Section 7(C)(1)(n), denial is warranted when the applicant has "created or fostered an **appearance** of impropriety, by virtue of their present or past activities, criminal record, reputation, habits, or **associations,** or has otherwise engendered a situation which threatens the public interest in the integrity of gaming, the effectiveness of gaming regulation and control, or in fair and lawful practices, methods, and financial arrangements in gaming." (emphasis added). Special notice should be given here to the word "appearance." The "appearance of impropriety" that threatens the public interest in the integrity of gaming is all that is required to justify denial of a license. The statute does not require actual proof of impropriety, such as a criminal conviction, for the Division to deny an application for a license.

The Board noted in its written reasons that Mr. Bonano's character is not an issue. He was a police officer and civil sheriff in good standing for 27 years, and

his good reputation in the boxing industry has never been questioned. He has, however, conducted business with some less than exemplary business associates throughout his years in the private sector. After retiring as a deputy sheriff, Mr. Bonano was employed as a supervisor for A-Ace Video Gaming for one year. A-Ace Video Gaming was owned by Robert Guidry, who pled guilty to a federal felony related to his ownership of a Louisiana licensed riverboat. At A-Ace Video Gaming Mr. Bonano worked with Frank Caracci, whom Mr. Bonano, through his years as a police officer, knew was identified as a member of organized crime in New Orleans and a convicted felon. Mr. Bonano was employed as a boxing promoter for Banner Productions, owned by Arthur Pelullo, identified as a member of organized crime in Philadelphia. And there are questions regarding Mr. Bonano's relationship with Mike Stuebben, a bookmaker and gambler with felony convictions.

All that is needed for denial of a license is the appearance of impropriety, through prior associations, that threatens the public interest in the integrity of gaming. The Board did not abuse its discretion in finding that Mr. Bonano's association with four persons affiliated with organized crime or convicted of a felony, all connected with the gaming industry, creates an appearance of impropriety such that a threat exists as to the public interest in the integrity of gaming. This is correct even though Mr. Bonano has never been convicted of a crime himself.

The State of Louisiana has a clear, legitimate and compelling interest in regulating the gaming industry. The Legislature has provided for the strict regulation of the gaming industry in LSA-R.S. 27:2. Furthermore, the Legislature has explicitly provided that a video-gaming license is a pure and absolute revocable privilege and not a right, property or a protected interest under the

constitutions of either the United States or the State of Louisiana. <u>See</u> LSA-R.S. 27:2B; LSA-R.S. 27:301D. We believe that a non-gaming supplier's license equally falls under the State's interest in regulating the gaming industry. As such, the licensing requirements for anyone associated with the gaming industry should not be taken lightly.

Finally, Bonano alleges that the majority of the Board has not heard the case or read the record and as such it is entitled to a new hearing in order to file briefs and present oral argument as provided in LSA-R.S. 49:957. The Board reviewed the decision of the hearing officer in an open meeting held June 2, 2000. The transcript of that meeting reveals that counsel presented extensive oral argument on this issue. Eight of the nine voting members of the board were present and voted five to three in a roll-call vote to reverse the hearing officer and deny a license to Bonano.[2] Bonano's argument on this issue is utterly without merit.

For the above reasons we affirm the ruling of the district court denying Leslie Bonano Inc.'s petition for judicial review and assess the costs of this appeal against Leslie Bonano, Inc.

**AFFIRMED.**

---

[2]     The Louisiana Gaming Control Board consists of nine members and two ex officio members. LSA-R.S. 27:11A. The ex officio members are nonvoting members who are not counted for the purpose of establishing a quorum. LSA-R.S. 27:11D.

# **EXHIBIT B**

SCI Report

# INTRODUCTION

In 1992, the Commission conducted a two-day public hearing on the control of bars by organized crime and issued a report. The Commission identified several such establishments and the organized crime members and associates holding interests in them. Most of the owners of record and all of the organized crime figures invoked their Fifth Amendment right against self-incrimination at the hearing and refused to answer questions. The hearing and report featured the testimony of a former made member and a former associate of the Southeastern Pennsylvania-South Jersey Family of La Cosa Nostra. In striking testimony, former captain Thomas "Tommy Del" DelGiorno and a former associate, whose identity had to be concealed for his protection, explained why organized crime gravitates toward liquor-licensed establishments — from use of the business to launder money to use of the premises as a safe haven to meet and conduct illegal business, including the plotting of murders. They also identified numerous members and associates from seven different La Cosa Nostra families who have held undisclosed interests in or exerted influence over bars throughout New Jersey.

During its investigation, the Commission sought access to a former, high-ranking La Cosa Nostra member who, at the time, was in federal custody and was testifying in numerous federal prosecutions of organized crime figures in New York, Connecticut and Pennsylvania. Philip Leonetti served as underboss and confidant to his uncle Nicodemo Scarfo, the boss of the Southeastern Pennsylvania- South Jersey Family of La Cosa Nostra, commonly referred to as the Scarfo Family during his reign from March 1981 to early 1991.[1] Leonetti was at his uncle's side as meetings were held and decisions made. His intimate knowledge of the Family's activities and operations ranks next to that of Scarfo himself.

To date, Leonetti has testified in eight federal trials, plus three re-trials, and three state trials in prosecutions of the Pittsburgh La Cosa Nostra and the Patriarca, Genovese, Gambino/Gotti, Lucchese, Colombo and Bruno/Stanfa Families. His testimony has led to the convictions of more than 15 made members and 23 associates, including Nicholas Bianco, who was elevated from underboss to boss of the Patriarca Family of New England following his indictment and prior to his conviction, together with virtually the entire hierarchy of the Patriarca Family; Charles "Chucky" Porter, underboss of the Pittsburgh La Cosa Nostra; Venero "Benny Eggs" Mangano, consigliere of the Genovese/Gigante Family in New York; Benedetto Aloi, consigliere of the Colombo Family in New York; Santo Idone, a captain of the Bruno/Scarfo Family, and acting captain Michael Taccetta and soldiers Anthony "Tumac" Accetturo,[2] Martin Taccetta and Thomas Ricciardi, all of the New Jersey branch of the Lucchese Family. Leonetti also testified at the sentencing hearing of Patriarca boss Raymond J. Patriarca, Jr.

Leonetti proved valuable to the federal government in areas beyond criminal prosecutions. He provided a 20-page declaration that formed the basis for the federal government's 1990 civil racketeering suit resulting in the court ordered takeover of Local 54 of the Hotel Employees Restaurant Employees International Union and the ultimate removal of its key officials, who were Bruno/Scarfo associates. Leonetti also provided information that contributed to the 1993 federal indictment of Vincent "The Chin" Gigante, boss of the Genovese/Gigante Family in New York. In addition, the prospect of Leonetti's testimony has been credited, in part, with causing underboss Salvatore "Sammy the Bull" Gravano to cooperate with federal authorities against his boss, John Gotti, the head of the Gambino/

---

[1] After his incarceration in January 1987, Scarfo initially ran the Family through Leonetti, until his imprisonment in April 1987, and then through Anthony Piccolo until early 1991, when John Stanfa became the boss.

[2] In February 1971, Accetturo was the caporegime in charge of the New Jersey branch of the Lucchese Family and fled the state to avoid a subpoena issued by the Commission.

Gotti Family in New York. When Leonetti was re-sentenced on his federal convictions in May 1992, the court recognized him as "the most significant crime figure who chose to cooperate" at that time and termed his cooperation "extraordinary" and "outstanding." Leonetti's sentence was reduced from 45 years to six and one-half years.

This report, a follow-up to the Commission's 1992 report, is the culmination of numerous and extensive interviews with Leonetti over the past two and one-half years, as access to him was arranged by federal authorities. It sets forth Leonetti's account of events as related to a Commission special agent. The quoted material that appears in this report is the agent's summary of those interviews.

Leonetti disclosed to the Commission startling new information about nine of the bars previously identified by the Commission and the organized crime figures who have owned or controlled the liquor licenses. Two of the bars — Jerry Blavat's Memories in Margate City and the Coral Reef in Bellmawr — continue to operate. Leonetti also linked organized crime to 14 additional bars in New Jersey, as well as numerous ones in Philadelphia. These bars include two that the Gambino Family had operated in south Jersey. One of the organized crime bars newly revealed by Leonetti is still licensed — Maynard's in Margate City. In the course of preparing this report, the Commission uncovered a fourth active license that has been utilized by an organized crime associate, who was known to Leonetti, in his operation of Hooty Moo's Beef & Ale in Waterford Township. A fifth active license — Frog Rock Country Club in Hammonton — has as one of its owners an individual known to Leonetti as a prior owner of another restaurant and bar. Leonetti also established the organized crime ownership of a retail distribution liquor license, which was held by attorney Harold Garber and real estate salesperson/broker Alvin Lippman until April 1995 and had been used by them to operate A.C. Discount Liquors in Atlantic City.

Equally compelling were Leonetti's accounts of Scarfo's own involvement with bars. He outlined Scarfo's ownership of several New Jersey bars, his use of fronts to conceal his ownership interests, his use of bars as the sites for murders, the tribute that he received from bar owners and his frequenting of bars both to socialize and to discuss his organized crime business.

In relating his knowledge about organized crime's involvement in bars, a subject that had heretofore never been explored with him, Leonetti exposed many of the Scarfo Family's day-to-day activities and shed new light on the operation of organized crime. He intertwined the role of bars in detailing the actions of both Scarfo and the Commission of La Cosa Nostra in the wake of the murders of bosses Angelo Bruno and Philip Testa. He also chronicled the "making," or induction, ceremonies; the Family's relationship with attorneys; its dealings with politicians; its extortion of "street tax"; its involvement with labor unions, and its "sit-downs" with other La Cosa Nostra families to resolve disputes. Leonetti revealed the sit-downs and meetings that he and Scarfo attended with Gambino Family boss John Gotti and his predecessor, Paul Castellano, to settle a dispute involving a New Jersey bar.

Leonetti's revelations underscore once again the ease with which organized crime has been able to pierce New Jersey's alcoholic beverage licensing system. It is evident from the facts disclosed by Leonetti that particular liquor licenses passed without government interference from one organized crime member to another and that certain organized crime members became involved in one bar after another. For example, a bar in Atlantic City was operated by four different groups of organized crime figures utilizing the same liquor license, and one Scarfo Family associate, Sy Hoeflich, owned bars in Atlantic, Gloucester and Camden Counties. Accordingly, the conclusions and recommendations made by the Commission in 1992 are reiterated in this report.

### Talk of Murder

Leonetti related three episodes when Blavat participated in conversations with Scarfo about killing people. The first concerned the murder of Scarfo Family associate Frank "Frankie Flowers" D'Alfonso, who was targeted by Scarfo because of his refusal to show loyalty by paying street tax. Leonetti recited Blavat's offer to Scarfo to set up D'Alfonso for a beating. In doing so, he again exposed Scarfo's predilection toward murder and the protocol followed by La Cosa Nostra families:

> Within a month or two of becoming the boss, Scarfo sent Scarfo Family consigliere Frank Monte to tell Frank "Frankie Flowers" D'Alfonso that Scarfo wanted a portion of D'Alfonso's profits from his business interests. D'Alfonso, who was friendly with Blavat, was an associate of the Scarfo Family. Scarfo knew that D'Alfonso was a moneymaker who had been close with Angelo Bruno. Scarfo thought that Monte might be able to get D'Alfonso to make extortion payments to Scarfo because Monte and D'Alfonso had known each other for many years, but D'Alfonso resisted. D'Alfonso kept making excuses, even after Scarfo had Monte make additional trips in an attempt to persuade him to make the payments.

> By the fall of 1981, Scarfo decided that he wanted D'Alfonso killed for ignoring his demand.

Before killing D'Alfonso, Scarfo sought the approval of the boss of the Genovese/Gigante Family because of the potential impact of D'Alfonso's death on a member of that Family:

> Scarfo and Leonetti travelled to New York City to discuss the matter with Bobby Manna. Scarfo explained the situation to Manna and informed him that he wanted to have D'Alfonso killed. Manna told Scarfo to first give D'Alfonso a beating to try to convince him to pay attention to Scarfo. Instead of immediately killing D'Alfonso, Scarfo discussed the matter with Manna because D'Alfonso was partners with Genovese Family member "Benny Eggs" Mangano in carnival amusement games at the annual Feast of San Gennaro in the Little Italy section of Manhattan. Soon after Scarfo and Leonetti returned from meeting with Manna, Scarfo held a meeting in the Atlantic City area and assigned Salvatore "Salvie" Testa to give a beating to D'Alfonso. The meeting was attended by Scarfo Family members Salvatore "Chuckie" Merlino, Lawrence "Yogi" Merlino, Joseph "Chickie" Ciancaglini, Scarfo, Testa and Leonetti.

However, Blavat unwittingly interfered with Testa's attempts to inflict the beating:

> After tracking D'Alfonso for only a few days, Testa contacted Scarfo and informed him, in Leonetti's presence, that Blavat was making it difficult for Testa to beat up D'Alfonso. Testa told Scarfo that Blavat was getting in the way because he was always with D'Alfonso. D'Alfonso did business from an office, which used to be a flower shop, located near the Italian Market in south Philadelphia.

As a result, Scarfo spoke with Blavat:

> After receiving Testa's information about Blavat, Scarfo called Blavat to his Atlantic City apartment, where Scarfo and Leonetti spoke to him. Scarfo told Blavat that he was trying to have D'Alfonso beaten and that Blavat was getting in the way. Scarfo instructed Blavat to stay away from D'Alfonso. When Scarfo explained the situation to Blavat, Blavat offered to set up D'Alfonso for the beating. Blavat said that he could "walk" D'Alfonso some place where it would

*be easy for Scarfo's people to beat him. Scarfo turned down Blavat's offer and told Blavat to just stay away from D'Alfonso because Scarfo already had people working on it.*

Blavat apparently complied with Scarfo's order to avoid D'Alfonso and the beating was administered:

*In October of 1981, a few weeks after Scarfo and Leonetti met with Manna, Salvatore Testa and a friend of his, Eugene "Gino" Milano, severely beat D'Alfonso a short distance from D'Alfonso's residence. At the time of the beating, Milano was an associate of the Scarfo Family. In January of 1982, a few months after the beating, Milano was inducted into La Cosa Nostra by Scarfo. Within a few days of the beating, Testa travelled to the Atlantic City area to report to Scarfo and Leonetti about the beating. Among other things, Testa told them that he used a baseball bat and Milano used a metal pipe or bar.*

*About six months after the beating, Scarfo called for D'Alfonso to meet with him. D'Alfonso and Frank "Blinky" Palermo travelled to Margate, N.J., where they met with Scarfo, Leonetti and underboss Salvatore "Chuckie" Merlino at a restaurant. Scarfo and Merlino told D'Alfonso that, in the future, they wanted a portion of the profits from all the business deals he became involved in. During the meeting, D'Alfonso stated that he wasn't sure what caused his injuries, but thought that he had been hit by a truck. D'Alfonso said that to let Scarfo, Leonetti and Merlino know that he had not said anything to law enforcement authorities about the beating.*

Although D'Alfonso initially yielded to the mes-

sage delivered by the beating, he failed to make regular payments to Scarfo and Scarfo once again sought to have him killed. This time, however, the Genovese/Gigante Family approved the "hit":

*Some time during the year after the beating, D'Alfonso turned over $50,000 in cash to Scarfo. Scarfo told Leonetti that the $50,000 came from D'Alfonso's profits from setting up the showing of a closed-circuit telecast of the World Heavy Weight Championship fight between Gerry Cooney and Larry Holmes.*

*After D'Alfonso gave Scarfo the $50,000, he never turned over any more money to Scarfo. By the middle of 1985, Scarfo was so angered by the D'Alfonso matter that he again decided to have D'Alfonso killed. Scarfo and Leonetti again travelled to New York City to see Manna. Scarfo explained that D'Alfonso had not given Scarfo any more money since D'Alfonso turned over the $50,000 two or three years earlier and that Scarfo was tired of not receiving respect from D'Alfonso. Manna told Scarfo that he didn't object to the killing. Manna also said that he would advise "Benny Eggs" Mangano of the situation and have him wrap up his business dealings with D'Alfonso. Shortly after he and Leonetti returned, Scarfo made plans to have D'Alfonso murdered. D'Alfonso was shot to death near his south Philadelphia home in July of 1985.[14]*

\* \* \* \*

Blavat also discussed a killing with Scarfo when he requested the murder of a competing Philadelphia disc jockey:

*During the year following Scarfo's release from prison in January of*

---

[4]On April 5, 1989, six Scarfo members and associates were convicted for their involvement in D'Alfonso's murder. The convictions were overturned on appeal and a re-trial is scheduled. Leonetti is expected to testify.

*1984, Blavat went to Scarfo's apartment on at least two occasions to complain about Philadelphia disc jockey Hy Lit. Leonetti was present at Scarfo's apartment during these conversations. The first time that Blavat went to Scarfo, Blavat complained that Lit was taking business away from him by competing with Blavat's rock and roll "oldies" business and radio show and asked Scarfo to have Lit killed. Scarfo told Blavat that he was "crazy" and that he couldn't just kill Lit because Lit was competing with Blavat. Blavat then asked if Scarfo could have Lit beaten. Scarfo didn't want to do that either, so he put Blavat off by telling him that he wanted to think about Blavat's request and learn more about the situation.*

*Within a couple of months of asking Scarfo to kill Lit, there was at least one other time, at Scarfo's apartment, when Blavat brought up the Lit situation. On that occasion, Blavat told Scarfo and Leonetti that he and Marc Puppo were considering damaging a car or other property owned by Lit.*

\* \* \* \*

The final incident concerned Scarfo's plan to kill Kenneth Shapiro, a Family associate, Philadelphia businessman and owner of an Atlantic City real estate development company. Shapiro was targeted in the 1982-1983 federal probe of the activities of then Atlantic City Mayor Michael J. Matthews. When Shapiro was subpoenaed before a federal grand jury, Scarfo dispatched Blavat to warn him against implicating the Scarfo Family in his prior dealings with Matthews. When Scarfo feared that Shapiro was going to cooperate with the federal government, he plotted his murder with Blavat's assistance. Leonetti set the stage for Shapiro's early involvement with Matthews:

*In late 1981 or early 1982, Local 54 president Frank Gerace sent word for Scarfo and Leonetti to meet him at his mother's Atlantic City apartment. There, Gerace told Scarfo and Leonetti that he had been contacted*

*by Michael Matthews, who advised him that he wanted to run for mayor of Atlantic City. Matthews informed Gerace that if the Scarfo Family provided him with campaign financing and support, he would assist the Family if elected. Scarfo thought that it was an idea that would pay off in the future. Scarfo told Gerace to do whatever he could at Local 54 to support Matthews' run for mayor. He also told Gerace to meet with Matthews and tell him to contact Kenneth "Kenny" Shapiro, who would provide Matthews with money and support. Shapiro, an associate of the Scarfo Family, was a businessman from Philadelphia and the owner of a real estate development company, known as Sea Tex Associates, on Atlantic Avenue in Atlantic City. Gerace told Scarfo and Leonetti that he would get Local 54 to endorse Matthews for mayor and would arrange for the union to pay for campaign materials, such as signs and flyers. Gerace also said that he could have the union hold a rally or parade for Matthews.*

Scarfo delegated Leonetti to make the appropriate arrangements with Shapiro:

*The day after Scarfo and Leonetti met with Gerace, Scarfo sent Leonetti to meet with Shapiro at Sea Tex Associates and explain the situation to him. Leonetti told Shapiro that Matthews would be contacting him and that Scarfo wanted Shapiro to provide Matthews with financial assistance and any other help that he needed. Leonetti explained to Shapiro that Matthews had agreed to help the Scarfo Family if he got elected and that if Matthews was elected, the Scarfo Family could make a big score and influence things like city contracts, zoning and land deals. Shapiro was in full agreement. After speaking to Shapiro, Leonetti then met with Gerace on the same day to inform Gerace that he had spoken to Shapiro*

*and that it was alright for Gerace to have Matthews contact Shapiro. Not long after Leonetti contacted Shapiro about Matthews, Scarfo and Leonetti both went to Sea Tex Associates to discuss the matter further with Shapiro.*

As intended, Shapiro became the conduit of monies for Matthews' campaign:

*In the early 1980s, Leonetti visited Sea Tex Associates several times a week to see Shapiro, including the periods when Matthews was campaigning for mayor and while he was mayor. Shapiro often talked to Leonetti about Matthews' campaign. Shapiro told Leonetti about the campaign expenses that he was paying for, such as advertising, signs, handouts, bands, as well as personal and entertainment costs for Matthews. Shapiro complained more than once about how much money it was costing him and that Matthews was wasting money on personal expenses. Matthews was elected mayor of Atlantic City a couple of months before Scarfo went to federal prison in August of 1982 on his firearms conviction. Shortly after Matthews was elected, Shapiro told Leonetti that he had funneled about $150,000 into Matthews' campaign.*

After he was elected mayor, Matthews acted in the interest of the Scarfo Family and Shapiro continued to be involved with him:

*After Matthews became mayor, he used his influence to lobby for certain land deals, city contracts and real estate development projects for the Scarfo Family. Shapiro, Leonetti and Frank Lentino, an associate of the Scarfo Family, were in regular contact with Matthews about matters that he was pushing for the Scarfo Family.*

*Several different locations were used to meet with Matthews, including Shapiro's condominium at the Island House on Atlantic Avenue in Margate, N.J. Leonetti met with Matthews and others at Shapiro's condominium at least two different times. On one of those occasions, Leonetti met with Matthews, Shapiro, Bobby Simone and Stanley Branche. Simone was an associate of the Scarfo Family and an attorney who represented Scarfo and Leonetti. Branche was a Philadelphia businessman who was friendly with Simone. Branche was at the meeting to obtain Matthews' support for a grand prix auto race in Atlantic City. Leonetti was there to get Matthews to push for the sale of some city-owned property that Leonetti thought, at the time, might financially benefit him, Scarfo and members and associates of the Scarfo Family. As it turned out, the city-owned property was related to an FBI investigation that later resulted in the conviction of Matthews and Scarfo Family associate Frank Lentino. On another occasion, Leonetti met with Matthews, Shapiro and a Scarfo Family associate named Arthur "Artie" Pelullo. Leonetti arranged for the meeting because he wanted Pelullo to apologize to Matthews for threatening him. During 1982 or 1983, when the Scarfo Family was involved with Matthews, Pelullo asked Matthews to help him get some type of license so that his limousine company could operate in Atlantic City. When Pelullo was having trouble getting the license, he threatened to kill Matthews, who contacted Leonetti for help. Leonetti set up a meeting at Shapiro's condominium to settle the matter and made Pelullo apologize to Matthews. Leonetti also met Matthews at the Mars Restaurant, a bar and restaurant owned by Pelullo on South Street in Philadelphia.[15]*

---

[15]The Mars Restaurant appears at pages 99 through 101 of this report.

The relationship between Matthews and the Scarfo Family abruptly ended when the federal investigation into Matthews' activities with organized crime became known:

> In late 1983, a month or two before Scarfo was released from prison in January of 1984, Leonetti found out that the FBI was investigating the illegal activities between the Scarfo Family and Matthews. Leonetti learned about the investigation a day or two before it made the news. At first, Matthews decided to help the FBI and gave them a confession, but shortly thereafter decided against cooperating.

When the federal government turned its attention to Shapiro, Scarfo became concerned about his loyalty and selected Blavat, who resided in the same complex as Shapiro and was friendly with him, to deliver a message. During Scarfo's meeting with Blavat, Blavat offered to kill Shapiro:

> After Scarfo's release from prison in January of 1984, he and Leonetti learned that Shapiro was called before a federal grand jury concerning the Matthews investigation. Because Scarfo and Leonetti were worried that Shapiro might give information to the grand jury that would hurt them and their people, they met with Blavat at Scarfo's apartment. Scarfo told Blavat to contact Shapiro to tell him not to say anything to the grand jury that would implicate anyone associated with the Scarfo Family. Scarfo also directed Blavat to inform Shapiro that Scarfo wanted $100,000 to pay for Leonetti's expected legal expenses from the federal investigation. After Scarfo explained what he wanted Blavat to do, Blavat offered to murder Shapiro by poisoning his coffee. Blavat told Scarfo and Leonetti that he and Shapiro often had coffee in the morning. They both lived in the Society Hill Towers, which were high-rise condominiums in the Society Hill section of Philadelphia.

> Scarfo told Blavat to just deliver the message to Shapiro and not worry about killing him.

> A short time later, Blavat met with Scarfo and Leonetti at Scarfo's Atlantic City apartment and told them that he had spoken to Shapiro. Blavat explained that Shapiro agreed not to say anything damaging in the grand jury, but wanted to talk directly to Scarfo about the $100,000 for Leonetti's expected legal fees. Scarfo and Leonetti never received the $100,000 because Scarfo didn't trust Shapiro enough at that point to meet with him.

Scarfo then began making plans for Shapiro's murder, but later abandoned them. However, when Scarfo was plotting the murder, he again turned to Blavat for assistance:

> Right after Blavat came back from meeting with Shapiro, Scarfo started making plans to have Shapiro killed. Scarfo told Blavat that he might have to kill Shapiro. He also told Blavat that he had Thomas "Tommy Del" DelGiorno and Francis "Faffy" Iannarella checking out the area around the Society Hill Towers for a possible location to kill Shapiro. DelGiorno and Iannarella were made members of the Scarfo Family. Blavat agreed to assist Scarfo in any way that he could. Blavat helped Scarfo make plans for the possible "hit" by feeding Scarfo information about Shapiro's condominium, habits and movements around the Society Hill Towers.

> Scarfo and Leonetti met with Scarfo Family captains Thomas "Tommy Del" DelGiorno and Francis "Faffy" Iannarella at the Saloon Restaurant on South 7th Street in Philadelphia to tell them to begin making plans for a possible "hit" on Shapiro. Scarfo told them to check out the area around the Society Hill Towers be-

*cause they might have to kill him there. Scarfo also said that Blavat was informing him about Shapiro's movements. Scarfo later became satisfied that it was not necessary to kill Shapiro.*

*Michael Matthews and Frank Lentino both pleaded guilty to federal charges and were sentenced to federal prison. Leonetti was indicted in the same case, but the charges against him were later dismissed.*

In November 1984, Matthews pled guilty to extortion by a public official and, in January 1985, was sentenced to 15 years in federal prison.

## LIDO RESTAURANT/MAYNARD'S

Albert A. Troiano is the current owner of Maynard's in Margate (Atlantic County) and the former owner of the Lido Restaurant in Atlantic City (Atlantic County). In February 1966, Troiano and a relative obtained the liquor license for Maynard's. In September 1968, Troiano obtained 100% interest in the license and presently holds the license under the name of Maynard's, Inc. Troiano held the liquor license for the Lido Restaurant under the name of Cotroy, Inc., from January 1974 until November 1982, when he sold the restaurant and license. However, in 1983, Troiano resumed controlling interest in the license when the corporate owner filed for bankruptcy and Troiano was appointed the receiver. The license was ultimately sold in January 1985.

Leonetti disclosed information about Troiano that bears upon his qualifications to hold a liquor license. He related that one of Troiano's bars was frequented by Scarfo Family associates and members:

*Scarfo, Leonetti and several other made members of the Family often gathered at the Lido Restaurant to socialize and discuss Family business. Some of the Family members who went there were Lawrence "Yogi" Merlino, Salvatore "Chuckie" Merlino, Thomas "Tommy Del"*

*DelGiorno and Francis "Faffy" Iannarella. Associates of the Family who were regular customers were Saul Kane, Rick Casale, Phillip "Moe" McFillin, Joseph "Joey" Merlino and Joseph "Joe" Ligambi. Ligambi was later inducted as a La Cosa Nostra member in the Family by Scarfo.*

In fact, in January 1982, the Lido Restaurant was the site of a celebration party that was held following one of Scarfo's induction ceremonies:

*In January of 1982, Scarfo held a La Cosa Nostra induction ceremony at the Vineland, N.J., home of Family associate Robert "Toro" Locicero and inducted several proposed members into the Family. Among those inducted were Thomas "Tommy Del" DelGiorno, Francis "Faffy" Iannarella and Pasquale "Pat the Cat" Spirito. After the ceremony, Scarfo, Leonetti, DelGiorno, Spirito, Iannarella and Lawrence Merlino travelled from Locicero's house to the Lido Restaurant to celebrate. Scafidi was working at the Lido Restaurant that night and talked with Scarfo, Leonetti and the others.*

Leonetti also provided an example of a favor that Scarfo requested of Troiano. The favor related, once again, to obtaining employment for Family member Sam Scafidi:

*In 1980 or 1981, Scarfo Family member Samuel Scafidi went to Scarfo's Atlantic City apartment and asked Scarfo, in Leonetti's presence, to find him a job. Scarfo told Leonetti to see Albert "Al" Troiano about giving Scafidi a job. At the time, Troiano owned a bar and restaurant known as the Lido Restaurant on Atlantic Avenue in Atlantic City and a bar known as Maynard's on Amherst Avenue in Margate. Leonetti knew Troiano from going to the Lido Restaurant with other members and as-*