United States District Court
For the Southern District of New York

Jason M. Santarcangelo, Esq. (JMS 4492)
**DINES AND ENGLISH, L.L.C.**
685 Van Houten Avenue
Clifton, New Jersey 07013
(973) 778-7575
Attorney for Plaintiff, New Jersey Sports Productions, Inc.

---

**NEW JERSEY SPORTS PRODUCTIONS, INC :**
**d/b/a MAIN EVENTS**

                           :

    **Plaintiff,**

                           :

**v.**

                           :

**PANOS ELIADES, PANIX PROMOTIONS,**
**LTD., PANIX OF THE U.S., INC., BANNER** :
**PROMOTIONS, INC., DON KING**
**PRODUCTIONS, INC. AND JOHN DOES 1-5** :

    **Defendants.**

                           :

Civil Action No. 06 CV 1509 (HB)

**CERTIFICATION OF**
**JASON M. SANTARCANGELO**
**IN SUPPORT OF CONTEMPT**
**MOTION**

---

1.  I am an attorney at law in the State of New Jersey and an associate with Dines and

English, LLC, counsel for New Jersey Sports Productions, Inc. in this matter.

2.  On Monday, February 12, 2007 my office received via delivery by the United States

Postal Service a letter dated February 6, 2007 addressed to the Honorable Harold Baer, Jr. from

Panos Eliades.

3.  In the package were purported answers to the document demands and interrogatories

to both Panos Eliades and Panix of the U.S., Inc. Also included in the package were the cover

letter, six documents and a facsimile cover sheet. The documents and facsimile cover sheet were

included twice.

4. One of the documents sent in the package received was a December 12, 1996 document entitled "Agreement." The document sent in the package by Mr. Eliades which is altered. A true copy of the version sent by Mr. Eliades is attached as Exhibit A. Particularly, when examining page 3 of the Agreement, there is a hand written change that is not in previous versions. In the version sent by Mr. Eliades, on page three, the word "Inc." is scratched out and replaced with the handwritten word "Limited" in the Panix Promotion's line.

5. Attached as Exhibit B is a true copy of the same December 12, 1996 Agreement identified in the Deposition of Panos Eliades, a case in which Panix Promotions, LTD. was a plaintiff, from the Nevada Suit District Court (Clark County, Nevada) Case No. A422631 which does not contain the alteration. Attached as Exhibit C is a true copy of the testimony given by Mr. Eliades identifying the December 1996 agreement.

6. Attached as Exhibit D is a true copy of the same agreement which does not contain the alteration submitted in the American Arbitration Association Case No. 141960041200SCF, in which Panix Promotions, LTD was a defendant.

7. In short Eliades has submitted a demonstrably altered document but not the original unaltered document.

8. Mr. Eliades has previously been found in contempt by Judge Baer on March 4, 2004. Judge Baer's Order found the Panix Parties to be in contempt of the February 15, 2002 Order requiring full disclosure. A true copy of the contempt finding is enclosed as Exhibit E. That finding was made even in the absence of the knowledge of the undisclosed Nevada case or the alleged transfer of interest. Of particular importance in Judge Baer's contempt finding of March 4, 2004 was footnote 6 which clarified the spirit of the disclosure order issued on February 15, 2002:

> **Although perhaps moot, the Court clarifies that the February 15 Order applies to all transactions initiated prior to February 15, 200(2), whose finalization post-dates the Order. If any such transactions still exist, Panix Parties should inform Lewis of those transactions and seek Lewis' approval for their eventual finalization.**

The Nevada case remained pending at that time but was not disclosed by Panix.  The clarification of the February 15, 2002 Order leaves no ambiguity as to the information that the Panix Parties were and remain required to disclose.  The Order covers Main Events as well as Lewis and is clear and unambiguous, as is the Order of February 15, as well.

9.  In addition to failing to disclose that his company, Panix Promotions, LTD. had instigated litigation seeking to recover funds for tortious interference from parties including DKP, Panos Eliades has a long and sordid history of failing to tell the truth.  For example, in a December 20, 2005 opinion from the High Court of Justice in London the Court found to the effect that "Mr. Eliades is a man prepared to lie on oath if it suits his purposes...Furthermore, the answers establish a preparedness to transfer assets to someone else or untruthfully assert that they had been transferred so as to ensure that a claim made by a third party might be defeated."  A true copy of the High Court's Opinion is attached as Exhibit F (See, e.g. ¶56.  See also, e.g., ¶¶ 63, 77, 83, 84, 85, 116, 117, 118.).

10. I hereby certify that the above is true.  If willfully false I recognize that I am subject to punishment.

Jason M. Santarcangelo

Date: February 21, 2007

# EXHIBIT A

# AGREEMENT

December 12, 1996

Dear Mr. Ruiz:

We have this day signed with you a Bout Agreement. Promotions Inc. ("BP") has agreed to promote and you have ... North American Boxing Federation ("N.A.B.F.") Championship ... Thunder Ruiz. Such Bout to be referred to herein as the Bout.

In consideration for BP having agreed to promote the Bout ... and in ... for the mutual agreement that should you be declared the winner of the Bout ... have the exclusive right to co-promote your first, second and third defense ... N.A.B.F. Championship or any other Bout including a World Championship Promotions, Inc. ("Panix") on the following terms and conditions :

1.    Your opponent in each Bout shall be selected by BP and Panix ... reasonable prior approval, which approval shall not be unreasonably ...

Each Bout shall be held on a date and at a site to be selected by BP.

2.    Your purse for each N.A.B.F. title defense shall be the following:

    a.)    For the first of your N.A.B.F. title defense, promoter ... fighter such amount as determined by agreement ... promoter and fighter but not less than $20,000.00.

    b.)    For the second of your N.A.B.F. title defense, promoter ... fighter such amount as determined by agreement ... promoter and fighter but not less than $25,000.00.

    c.)    For the third of your N.A.B.F. title defense, promoters ... fighter such amount as determined by agreement ... promoter and fighter but not less than $30,000.00.

    d.)    For the fourth of your N.A.B.F. title defense, promoters ... fighter such amount as determined by agreement ... promoter and fighter but not less than $35,000.00

9) For any other bout including a World Championship, fighter's purse shall be mutually agreed upon between fighter and promoters.

4. For each Bout hereunder, you shall execute and comply with terms of the prescribed State Athletic Commission form contract containing substantially the provisions set forth in the Bout Agreement executed for the bout.

5. During the term of this Agreement, you may not engage in any boxing matches or exhibitions other than those promoted or co-promoted by BP and Panix, and shall not contract with any other promoter without the express prior written consent of BP and Panix.

6. Should any Bout scheduled by BP and Panix hereunder be postponed for any reason or should you be under a temporary disability which results in the postponement of any title defense Bout scheduled pursuant to BP and Panix rights with respect thereto shall be carried over for the period of postponement or disability.

7. Notices. Whenever any notice or other communication is required to or delivered pursuant to this Agreement such notice shall be given and shall be delivered pursuant to this Agreement, such notice shall be in writing and shall be delivered in person or by Certified Mail, Return Requested, and shall be sufficiently given if personally delivered, or if by Mail, addressed as follows:

If to Promoter:

> Banner Promotions
> 1255 South 20th Street
> Philadelphia, PA 19146

If to Fighter:

> John Ruiz
> 88 Middlesex Street
> London, England E1 7DA

or to such other address as either party may by written notice, designate to the other party given in accordance with the paragraph.

2

a    **Governing Law.** This Agreement shall be governed and construed under the laws of the State of Delaware notwithstanding any choice of law principles.

a.a.    **Arbitration.** All claims and disputes relating to this Agreement shall be subject to arbitration at the option of any party in accordance with the arbitration rules of the American Arbitration Association, Philadelphia, Pennsylvania. Written notice of demand for arbitration shall be filed with the other parties and with the American Arbitration Association and the award rendered by the Arbitrator shall be final; judgment may be entered upon it in accordance with applicable law of any court having jurisdiction thereof. The losing party will be responsible for all legal fees.

This Agreement shall be for a term of eighteen (18) months from January 14, 1997.

... accurately and completely sets forth the understanding ... your agreement and acceptance as indicated below. This ... can be ... ed in counterpart.

ACCEPTED AND AGREED:

JOHN RUIZ                                   BANNER PROMOTIONS INC

_____                      _____
John Ruiz, Fighter                          Arthur K. Pelullo, President

_____
Manager

                                           PANIX PROMOTIONS, PTE Limited

                                           _____

1

# EXHIBIT B

08/01/98   13:44 FAX                                                    ☒006

# AGREEMENT

December 12, 1995

Dear Mr. Ruiz:

We have this day signed with you a Bout Agreement, whereby Banner Promotions Inc. ("BP") has agreed to promote and you have agreed to engage in a North American Boxing Federation ("N.A.B.F.") Championship Bout against James Thunder Paau. Such Bout to be referred to herein as the Bout.

In consideration for BP having agreed to promote the Bout and in consideration for the mutual agreement that should you be declared the winner of the Bout, BP shall have the exclusive right to co-promote your first, second and third defenses of said N.A.B.F. Championship or any other Bout including a World Championship with Panix Promotions, Inc. ("Panix") on the following terms and conditions :

1.    Your opponent in each Bout shall be selected by BP and Panix with your reasonable prior approval, which approval shall not be unreasonably withheld.

2.    Each Bout shall be held on a date and at a site to be selected by BP.

3.    Your purse for each N.A.B.F. title defense shall be the following:

   a.)    For the first of your N.A.B.F. title defense, promoters shall pay fighter such amount as determined by agreement between promoter and fighter but not less than $20,000.00.

   b.)    For the second of your N.A.B.F. title defense, promoters shall pay fighter such amount as determined by agreement between promoter and fighter but not less than $25,000.00.

   c.)    For the third of your N.A.B.F. title defense, promoters shall pay fighter such amount as determined by agreement between promoter and fighter but not less than $30,000.00.

   d.)    For the fourth of your N.A.B.F. title defense, promoters shall pay fighter such amount as determined by agreement between promoter and fighter but not less than $35,000.00.

01000002

08/01/98  13:45 FAX                                                          007

e)     For any other bout including a World Championship, fighter's purse shall be mutually agreed upon between fighter and promoters.

4.     For each Bout hereunder, you shall execute and comply with terms of the prescribed State Athletic Commission form contract containing substantially the provisions set forth in the Bout Agreement executed for the Bout.

5.     During the term of this Agreement, you may not engage in any boxing matches or exhibitions other than those promoted or co-promoted by BP and Panix (and shall not contract with any other promoter) without the express prior written consent of BP and Panix.

6.     Should any Bout scheduled by BP and Panix hereunder be postponed for any reason, or should you be under a temporary disability which results in the postponement of any title defense Bout scheduled pursuant to BP and Panix's rights with respect thereto shall be carried over for the period of such postponement or disability.

7.     **Notices.** Whenever any notice or other communication is required to be given or delivered pursuant to this Agreement, such notice shall be given in writing and shall be delivered pursuant to this Agreement, such notice shall be given in writing and shall be delivered in person or by Certified Mail, Return Receipt Requested, and shall be sufficiently given if personally delivered, or by Certified Mail, addressed as follows:

If to Promoter:

Banner Promotions
1255 South 26th Street
Philadelphia, PA 19146

If to Fighter:

John Ruiz
88 Middlesex Street
London, England  E1 7DA

or to such other address as either party may be written notice, designate to the other party given in accordance with the paragraph.

2

01000003

06/01/98  13:46 FAX                                                      @008
DEC-26-96 12:37 FROM:                          ID:                 PAGE   4/4

01000004

8.   **Governing Law.** This Agreement shall be governed and construed under the laws of the State of Delaware notwithstanding any choice of law principles.

8(a.) **Arbitration.** All claims and disputes relating to this Agreement shall be subject to arbitration at the option of any party in accordance with the arbitration rules of the American Arbitration Association, Philadelphia, Pennsylvania. Written notice of demand for arbitration shall be filed with the other parties and with the American Arbitration Association and the award rendered by the Arbitrator shall be final; judgment may be entered upon it in accordance with applicable law of any court having jurisdiction thereof. The losing party will be responsible for all legal fees.

9.   This Agreement shall be for a term of eighteen (18) months from the date of January 14, 1997.


It the foregoing accurately and completely sets forth the understanding between us, kindly indicate your agreement and acceptance as indicated below. This agreement can be signed in counterpart.


*ACCEPTED AND AGREED:*


JOHN RUIZ                              BANNER PROMOTIONS INC.


_____               _____
John Ruiz, Fighter                     Arthur R. Pelullo, President


_____
Manager                                PANIX PROMOTIONS, INC.


                                       _____


                            3

# **EXHIBIT C**

1          What led to the agreement of December '96?

2    Why would you take somebody that you were promoting and

3    enter into an agreement in which Banner was also a

4    promoter of that fighter?

5          A.    The fight was with Jimmy Thunder, and John

6    had lost, I think it was maybe 18 months or two years

7    ago -- Main Events had a boxer called David Tua, and

8    John had lost to David Tua in the first 20 seconds.  I

9    think he got knocked out.

10          We had to invest money to bring him back up.

11    And Jimmy Thunder was the NABF champion, and we did an

12    agreement with Banner Promotions, whereby John Ruiz

13    would fight Jimmy Thunder for the NABF championship,

14    which was a prestigious championship which elevated the

15    champion up into high rankings with the WBC.  And it

16    was agreed we would put him in, and we entered into a

17    joint promotional contract, with the winner being

18    jointly promoted by Banner and Panix.

19                    (Exhibit 1 marked.)

20    BY MR. HEJMANOWSKI:

21          Q.    Sir, I show you what the court reporter has

22    marked as Exhibit 1 to this deposition.  Take a moment

23    to refresh yourself with the document.

24          A.    All right.

25          Q.    This is the document we've been discussing,

1    the agreement between you and Banner?

2         A.    Yes.

3         Q.    At the time you signed this, was James

4    Thunder -- is it PO -- was he under contract to Banner?

5         A.    I believe so.

6         Q.    At that time you had Ruiz under contract with

7    Panix?

8         A.    Correct.

9         Q.    Are there any other agreements at this time

10   relating to the relationship between you and Banner?

11        A.    Not to my knowledge.  When you say "other

12   agreements" --

13        Q.    Here's what I'm looking at.  Excuse me as I

14   explain for a moment.  Maybe you can help me.  Here we

15   have an agreement where the two of you are going to

16   co-promote Ruiz, but there is no mechanism in this

17   agreement for decision-making, for resolving disputes

18   between Banner and Panix, or anything of that sort.

19   I'm wondering, was there any other agreements, like a

20   partnership agreement or something of that sort,

21   between the two of you that would define your

22   respective roles?

23        A.    Not that I recall.

24        Q.    What would be the distribution of income

25   earned under this agreement?

# EXHIBIT D

# A G R E E M E N T

December 12, 1996

Dear Mr. Ruiz:

We have this day signed with you a Bout Agreement whereby Banner Promotions Inc. ("BP") has agreed to promote and you have agreed to engage in a North American Boxing Federation ("N.A.B.F.") Championship Bout against James Thunder Peau. Such Bout to be referred to herein as the Bout.

In consideration for BP having agreed to promote the Bout and in consideration for the mutual agreement that should you be declared the winner of the Bout, BP shall have the exclusive right to co-promote your first, second and third defenses of said N.A.B.F. Championship or any other Bout including a World Championship with Panix Promotions, Inc. ("Panix") on the following terms and conditions :

1.   Your opponent in each Bout shall be selected by BP and Panix with your reasonable prior approval, which approval shall not be unreasonably withheld.

2.   Each Bout shall be held on a date and at a site to be selected by BP.

3.   Your purse for each N.A.B.F. title defense shall be the following:

    a.)   For the first of your N.A.B.F. title defense, promoters shall pay fighter such amount as determined by agreement between promoter and fighter but not less than $20,000.00.

    b.)   For the second of your N.A.B.F. title defense, promoters shall pay fighter such amount as determined by agreement between promoter and fighter but not less than $25,000.00.

    c.)   For the third of your N.A.B.F. title defense, promoters shall pay fighter such amount as determined by agreement between promoter and fighter but not less than $30,000.00.

    d.)   For the fourth of your N.A.B.F. title defense, promoters shall pay fighter such amount as determined by agreement between promoter and fighter but not less than $35,000.00



EXHIBIT
RUIZ
1

c)    For any other bout including a World Championship, fighter's purse shall be mutually agreed upon between fighter and promoters.

4.    For each Bout hereunder, you shall execute and comply with terms of the prescribed State Athletic Commission form contract containing substantially the provisions set forth in the Bout Agreement executed for the Bout.

5.    During the term of this Agreement, you may not engage in any boxing matches or exhibitions other than those promoted or co-promoted by BP and Panix (and shall not contract with any other promoter) without the express prior written consent of BP and Panix.

6.    Should any Bout scheduled by BP and Panix hereunder be postponed for any reason or should you be under a temporary disability which results in the postponement of any title defense Bout scheduled pursuant to BP and Panix's rights with respect thereto shall be carried over for the period of such postponement or disability.

7.    Notices. Whenever any notice or other communication is required to be given or delivered pursuant to this Agreement, such notice shall be given in writing and shall be delivered pursuant to this Agreement, such notice shall be given in writing and shall be delivered in person or by Certified Mail, Return Receipt Requested, and shall be sufficiently given if personally delivered, or by Certified Mail, addressed as follows:

If to Promoter:

         Banner Promotions
         1255 South 26th Street
         Philadelphia, PA 19146

If to Fighter:

         John Ruiz
         98 Middlesex Street
         London, England E1 7DA

or to such other address as either party may be written notice, designate to the other party given in accordance with the paragraph.

2

8.   Governing Law. This Agreement shall be governed and construed under the laws of the State of Delaware notwithstanding any choice of law principles.

8(a.)  Arbitration. All claims and disputes relating to this Agreement shall be subject to arbitration at the option of any party in accordance with the arbitration rules of the American Arbitration Association, Philadelphia, Pennsylvania. Written notice of demand for arbitration shall be filed with the other parties and with the American Arbitration Association and the award rendered by the Arbitrator shall be final; judgment may be entered upon it in accordance with applicable law of any court having jurisdiction thereof. The losing party will be responsible for all legal fees.

9.   This Agreement shall be for a term of eighteen (18) months from the date of January 14, 1997.

If the foregoing accurately and completely sets forth the understanding between us, kindly indicate your agreement and acceptance as indicated below. This agreement can be signed in counterpart.

ACCEPTED AND AGREED:

JOHN RUIZ                                    BANNER PROMOTIONS INC.

_____                     _____
John Ruiz, Fighter                           Arthur R. Pelullo, President

_____
Manager

                                             PANIX PROMOTIONS, INC.

                                             _____

3

# EXHIBIT E

04/2004 20:39 FAX 212 974 2944   Judd Burstein PC    Case 1:06-cv-01509-HB-JCF   Document 50   Filed 02/21/2007   Page 20 of 32   @003

3/04/2004 18:34 FAX 212 805    1        JUDGE HAROLD BAER JR.                                                      @002

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

PANIX PROMOTIONS, LTD. and PANIX OF THE
U.S., INC.,

                                *Plaintiffs*,

   -against-

LENNOX LEWIS, LENNOX LEWIS ENTERPRISES,
INC. and NEW JERSEY SPORTS PRODUCTIONS,
INC., d/b/a/ MAIN EVENTS

                                *Defendants.*

**OPINION AND ORDER**

**01 Civ. 2709 (HB)**

-------------------------------------------------------x

LENNOX LEWIS,

                          *Third-Party Plaintiff,*

   -against-

PANOS ELIADES, MILTON CHWASKY, RICHARD
ASHKENS and KYRIACOS ANTONIOU, d/b/a/ LEE
CHRISTIAN & CO.,

                        *Third Party Defendants.*

-------------------------------------------------------x

Hon. HAROLD BAER, JR., District Judge:[1]

    Defendants and Third-Party Plaintiffs Lennox Lewis, Lennox Lewis Enterprises, Inc.,
and New Jersey Sports Productions, Inc., d/b/a, Main Events (collectively "Lewis"), move for an
order pursuant to 18 U.S.C.A. § 401 and Federal Rule of Criminal Procedure ("Fed. R. Crim.
P.") 42 (1) holding plaintiffs and third-party defendants Panix Promotions, Ltd., Panix of the
U.S., Inc. and Panos Eliades[2] (collectively "Panix Parties") in civil contempt of this Court's
February 15, 2002 Order ("February 15 Order" or "Order"), (2) incarcerating Panos Eliades until
such time as Panix Parties comply with their Court ordered obligations, and (3) appointing an
Assistant United States Attorney or other prosecutor to initiate criminal contempt proceedings

---

[1] Audrey Roofeh, a fall 2003 intern in my Chambers and a second-year law student at Benjamin N. Cardozo School
of Law, provided substantial assistance in the research and drafting of this opinion.
[2] Panos Eliades is the sole shareholder and president of Panix Promotions Ltd. and Panix of the U.S., Inc. Eliades
Aff. at ¶ 1.

'04/2004 20:39 FAX 212 974 2944    Case 1:06-cv-01509-HB-JCF    Document 50    Filed 02/21/2007    Page 21 of 32
Judd Burstein PC                                                                    ☒004

13/04/2004 18:35 FAX 212 805    1    JUDGE HAROLD BAER JR.                                  ☒003

against the Panix Parties. For the foregoing reasons, Lewis' motion for civil contempt is granted-in-part and denied-in-part, and his request for criminal proceedings is denied.

## I.    BACKGROUND

The final judgment that serves as the basis for this motion was the culmination of a lawsuit initiated by the Panix Parties against Lewis, for breach of contract. Lewis counterclaimed for breach of contract, fraud, breach of fiduciary duty, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. On February 14, 2002, following a jury trial, a verdict in favor of Lewis was rendered, awarding Lewis $6,821,159 for breach of fiduciary duty, $396,082 for RICO violations, and $56,400 for fraud, and awarding $681,469 to Main Events for the fight promotion. On the following day, this Court issued the February 15 Order, restricting Panix Parties from engaging in certain transactions that could dilute its liquidity, thereby jeopardizing Lewis' recovery.[3]

The February 15 Order (1) restrained and enjoined Panix Parties from transferring or encumbering any assets other than in the ordinary course of business, (2) forbade the Panix Parties from engaging in any transaction with a value in excess of £3,500, or engaging in multiple transactions with a value in excess of £5,000 in any one day, without the Court's written approval, (3) ordered Panix Parties to produce to Lewis copies of all of their books and records, (4) ordered Panix Parties to execute written authorizations so that Lewis could acquire Panix Parties' financial information directly from banks, tenants, lenders, and credit card companies, and (5) ordered Eliades to be deposed about his financial affairs.

Lewis makes the following contempt allegations: (1) Panix Parties promoted a fight card on May 10, 2002, (2) Eliades paid a $7,000 hotel bill, (3) Eliades made an £11,000 wire transfer for an overdraft, (4) Eliades transferred title to a Mercedes-Benz, (5) Eliades allowed a charge to be registered against his property at 24 Parliament Hill ("Parliament Hill Property"), (6) Eliades transferred his interest in Treptos Investments to Rita Moustaka to avoid Lewis' discovery of this asset, (7) Panix Parties paid off approximately £46,000 of unsecured debt to Barclay's Bank, (8) Panix Parties violated discovery obligations concerning financial disclosure, (9) Eliades perjured

---

[3] On July 15, 2003, I issued an order on treble damages with regard to Panix Parties' RICO violations, pre-judgment interest, and bifurcated damages. Two judgments were entered nunc pro tunc against Panix, one for $792,164 and one for $7,273,641, with interest to be calculated from May 1, 1999 to the date of the verdict (February 14, 2002), based on the sum of $6,877,599, corresponding to the damages awarded for the state law claims. Two weeks later, on July 31, 2003, the motion to bifurcate damages was withdrawn and the Clerk of the Court entered one judgment against Panix for $8,065,805, with the same interest calculation as stated above. On August 14, Eliades appealed the July 31 Order, preventing enforcement of the judgment.

2

04/2004 20:40 FAX 212 974 2944  Case 1:06-cv-01509-HB-JCF  Document 50  Filed 02/21/2007  Page 22 of 32
Judd Burstein PC  ☒005

3/04/2004 15:35 FAX 212 805 ¼ ↓1·  JUDGE HAROLD BAER JR.  ☒004

himself in his testimony about Aris Kaissides, and (10) Eliades failed to follow both the *per diem* and transactional spending limits of the Order.

## II.  DISCUSSION

### A.  Standard of Review for Contempt

"A party may not be held in contempt unless the order violated by the contemnor is clear and unambiguous, the proof of non-compliance is clear and convincing, and the contemnor was not reasonably diligent in attempting to comply." *Equal Employment Opportunity Comm'n, et al. v. Local 638*, 81 F.3d 1162, 1171 (2d Cir. 1996) (internal quotations and citations omitted); *Peterson v. Vallenzano*, 858 F. Supp. 40, 41 (S.D.N.Y. 1994). A "clear and unambiguous order" is one "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989), quoting *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985). Any sanction imposed by this Court for non-compliance must be calculated either "to coerce future compliance with the Court's order, or to compensate the complainant for losses stemming from the contemnor's past noncompliance." *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.*, 279 F. Supp. 2d 341, 354 (S.D.N.Y. 2003), citing *United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947); *Perfect Fit Indus. v. Acme Quilting Co.*, 673 F.2d 53, 56- 57 (2d Cir.1982).

In the case of civil sanctions, the contemnor's actions need not be willful. *See Yurman Design Inc. v. Chaindom Enters., Inc.*, 99 Civ. 9307, 2003 WL 22047843, at *2 (S.D.N.Y. Aug 29, 2003) (quotation omitted). The burden of proof is on the party (here Lewis) seeking to hold the other in civil contempt, and is satisfied by the production of "clear and convincing" evidence. *See Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002). "[T]he clear and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation has occurred." *Id.*, citing *Callanan Indus., Inc.* v. *White*, 510 N.Y.S.2d 230, 231 (3d Dep't 1986). A party may overcome a finding of civil contempt by proving that (1) the Order is vague and indefinite as to whether a particular action is required or prohibited, (2) the party lacked knowledge of the terms of the Order, or (3) the proof of the violation is not clear and convincing. *See Sacco* v. *Burke*, 764 F. Supp. 918, 921 (S.D.N.Y. 1991).

Criminal contempt, pursuant to 18 U.S.C. § 401, provides a vehicle through which the Court may rectify contempt of its authority by fine or imprisonment. Taking such necessary action is "regarded as essential to ensuring that the Judiciary has a means to vindicate its own

3

'04/2004 20:40 FAX 212 974 2944    Judd Burstein PC    Case 1:06-cv-01509-HB-JCF    Document 50    Filed 02/21/2007    Page 23 of 32    ☐006

13/04/2004 18:35 FAX 212 805 ·51    JUDGE HAROLD BAER JR.    ☑005

authority without complete dependence on the other Branches." *ACLI Gov't Sec. Inc., v. Rhoades,* 989 F. Supp. 462, 468 (S.D.N.Y. 1997), quoting *Young v. United States,* 481 U.S. 787, 795 (1987). To hold a party in criminal contempt, "the government must prove beyond a reasonable doubt that: (1) the court entered a reasonably specific order; (2) the defendants knew of that order; (3) the defendants violated that order; and (4) their violation was willful." *U.S. v. Lynch,* 162 F.3d 732, 734 (2d Cir. 1998), quoting *United States v. Cutler,* 58 F.3d 825, 834 (2d Cir. 1995). Therefore, the burden on a party seeking to hold another in criminal contempt is greater than the burden on a party seeking only civil redress – as criminal contempt requires *willful* disobedience and demands proof *beyond a reasonable doubt.*[4] Because "criminal contempt is a crime in the ordinary sense" (*Int'l Union et al. v. Bagwell,* 512 U.S. 821, 826 (1994), quoting *Bloom v. Illinois,* 391 U.S. 194, 201 (1968)), "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings." *Int'l Union,* 512 U.S. at 826, quoting *Hicks v. Feiock,* 485 U.S. 624, 632 (1988).

The distinction between civil and criminal contempt is determined by the substance of the proceeding, and "character and purpose" of the sanction involved. *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 441 (1911). When the Court holds a party in civil contempt, "the punishment is remedial, and for the benefit of the complainant." *Id.* On the other hand, for criminal contempt, "the sentence is punitive, to vindicate the authority of the court." *See also Int'l Union,* 512 U.S. at 828.

**B.    Alleged Violations of the February 15 Order**

1.    24 Parliament Hill Property

Lewis asserts that Eliades violated the February 15 Order by allowing a lien to be registered against his Parliament Hill Property on February 21, 2002.[5] Eliades claims that since July 1988, Barclays Bank had a "legal charge" over the property at Parliament Hill as security for a loan to Panix Promotions Limited and Eliades. Eliades 1st Aff. ¶ 3. Eliades further claims that in November 2001 he decided to transfer the security held by Barclays Bank to Managa Properties, in exchange for Managa's settling a debt of £750,000, owed by Eliades to Barclays.

---

[4] Therefore, as to alleged violations where I find the basis for civil contempt to be lacking, I will not address the appropriateness of criminal contempt – it may be assumed that the more rigorous requirements of criminal contempt have not been met.

[5] The Order forbade any transfer after February 15th.

4

Eliades 1st Aff. Exh. 2. Lewis asserts that the documents for this Property are fraudulent, as demonstrated by the fact that there are two mortgage documents – one dated January 25, 2002, and the second, indicating the same transaction, dated February 8, 2002. Burstein Aff. ¶ 2.

While these mortgage documents reflect dates before the February 15 Order, the charge for the property was entered after the February 15 Order. While Eliades does not dispute the date of entry, he asserts that he initiated the transaction as early as October 31, 2001, well before the date of the Order, and only the formal entering of the charge postdated the Order. Eliades 1st Aff. Exh. 2. Further, because it is the responsibility of the mortgagee to register the transaction (Eliades 2d. Aff. ¶¶ 13-18), the timing of the register was not within Eliades' control, and therefore, it would be unfair to hold Eliades in contempt as a result of this chronology. This Court agrees. While Lewis is correct in asserting that the value of the property, $2,000,000, is significant, this does not alter the fact that Eliades had entered into this transaction long prior to the February 15 Order. This Court credits Eliades' defense that the February 15 Order "is vague and indefinite as to whether a particular action [here, conduct that pre-dates the Order but whose finalization post-dates the Order] is required or prohibited." Sacco, 764 F. Supp. at 921; see also City of New York v. Local 28, Sheet Metal Workers' Int'l. Ass'n, 170 F.3d 279, 282 (2d Cir. 1999) (a "party may be held in [civil] contempt only if it is proven by clear and convincing evidence that the party violated a clear and unambiguous order of the court."). Further, this Court is adverse to find contempt stemming from the actions of a non-party, unless it can be shown that the non-party received actual notice of the injunction and was acting in active concert or participation with the parties named in the injunction.[6] See Marshall v. Blasters, Drillrunners, and Miners Union, Local 29, 78 Civ. 4619, 1980 WL 2150 at *2 (S.D.N.Y. Apr 14, 1980), citing Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 129-130 (2d Cir. 1979).

Here, Managa's equitable lien on 24 Parliament Hill came into effect before the February 15 Order was issued and it is unclear whether Managa had actual notice of the injunction on the date that the lien was registered. Finally, the support that Lewis provides for his claim of fraudulent documentation – which amounts only to the presentation of two

---

[6] Although perhaps moot, the Court now clarifies that the February 15 Order applies to transactions initiated prior to February 15, 2003, whose finalization post-dates the Order. If any such transactions still exist, Panix Parties should inform Lewis of those transactions and seek Lewis' approval for their eventual finalization. If Lewis refuses to approve these transactions, the Panix Parties, if they wish to finalize the transactions within the duration of the Order, must apply to the Court for permission, including a brief description of (a) the transaction, (b) the reason for the delay in finalization, and (c) what impact, if any, the transaction will have on its financial liquidity. Lewis may submit an opposition, as desired.

5

agreements, with different dates -- falls far short of that necessary to prove "by a reasonable certainty" that the overdraft agreement, signed by Mr. S. Kalli of Barclays Bank (Eliades 1st Aff. Exh. 1), is "entirely suspect" (Burstein Aff. ¶ 6); *Levin*, 277 F.3d at 250. As a result, this alleged violation does not warrant a finding of civil contempt.

2.    Repayment of Loan to Barclays Bank

Lewis also claims that Eliades' repayment of a loan of £43,850 to Barclays Bank violated the February 15 Order. In defense, Eliades first argues that the payment was not a payment from Eliades to Barclays Bank – which would be prohibited by the Order -- but rather, was a payment from one account at Barclays Bank to several accounts at the Bank -- a payment "from Barclays Bank to Barclays Bank." Burstein Aff. ¶ 19. Later, Eliades alters his story, and alleges that the payment merely transferred the debt from Barclays Bank to Managa, in conjunction with the transfer of the charge against the Parliament Hill Property. Eliades 1st Aff. ¶¶ 39-41. In rebuttal, while Lewis brings to light that Eliades' new explanation "does not comport with his prior deposition testimony" (Burstein Aff. ¶ 19), he fails to provide evidence that either of Eliades' explanations is untrue. Therefore, while this Court cautions Eliades about the repercussions of untruthful deposition testimony (*see* 18 U.S.C. § 1623(a) (1982)), as Lewis has not provided clear and convincing evidence to refute Eliades' explanations, Lewis has failed to meet his burden with regard to this transfer, and therefore, civil contempt is improper.

3.    $7,000 Hotel Bill

Lewis claims that Eliades also violated the February 15 Order through his payment on February 16, 2002 of the $7,000 hotel bill for his stay in New York during the trial in this action (which lasted from February 1st through 14th. In defense, Eliades asserts that he had not yet learned of the Order when he paid his hotel bill. Eliades 1st Aff. ¶ 8. Eliades' defense is corroborated by his attorney, Jay Goldberg's statement that the "Order was not sent to Mr. Eliades' hotel" [when it was received Friday afternoon, February 15, 2002] and at that time, Eliades was therefore "unaware that the order had been signed." Steven Isser Affirm. ¶ 46, Exh. 19. It is well-settled that a person cannot be held in civil contempt of an order if he does not have knowledge of the order. *See Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.*, 646 F.2d 800, 808 (2d. Cir. 1981), citing *Vuitton et Fils S.A.*, 592 F.2d at 126; *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 51 (2d Cir. 1976), *cert. denied*, 429 U.S. 1093 (1977). Because Lewis has provided no credible evidence to rebut this defense, Lewis has failed

6

to prove by clear and convincing evidence that Eliades violated the Order, after having been apprised of its contents. Therefore, Eliades' payment of the February 16th hotel bill does not warrant a finding of civil contempt.[7]

4.   May 10 Fight Promotion

Lewis contends that Eliades' promotion of the May 10, 2002 fight violated the February 15 Order because Eliades exceeded the spending limits allotted by the Order[8] without the Court's approval. While it is undisputed that Eliades promoted the May 10 fight without the consent of Lewis' attorney, Judd Burstein,[9] Main Events' attorney, Patrick English, or the consent of this Court, and that Eliades expended far above £3,500 or even £5,000 to promote this fight, it is less clear that the May 10 promotion clearly and unambiguously violated the *spirit* of the February 15 Order. After all, in Eliades' May 7, 2002 letter to Burstein, he expressly demonstrated that while he anticipated spending £49,000 to promote the match, he planned to bring in £53,000, netting £4,000. Therefore, while this Court in no way condones Eliades' behavior, and even credits Lewis' classification of Eliades' action as a violation of the letter of the Order, it does not serve the purpose of the Order to hold Eliades in civil contempt for an action, which in hindsight, increased his net worth. Eliades 1st Aff. ¶¶ 11-24. *See Titra California, Inc. v. Titra Film*, 98 Civ. 0234, 2001 WL 1382587, at *5 (S.D.N.Y. Nov 6, 2001) ("It is the spirit of the order, not the letter, that must be obeyed"), citing *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942); *Nat'l Res. Bur. v. Kucker*, 481 F. Supp. 612, 615 (S.D.N.Y. 1979). Furthermore, the remedial function of civil contempt would not be met. *See ACLI Government Securities Inc., v. Rhoades*, 989 F. Supp. 462, 465-466 (S.D.N.Y. 1997). Therefore, Eliades' technical violation of the Order, through his May 10 fight promotion, does not result in a finding of contempt.[10]

---

[7] Because reasonable ignorance of the Order is a complete defense, it is unnecessary to reach the determination of whether payment of the hotel bill with full knowledge of the contents of the February 15 Order *would have been* actionable.

[8] The Order forbids the expenditure of more than £3,500 on any one transaction or more than £5,000 on multiple transactions in any one day.

[9] While the Court finds credible Eliades' assumption that Burstein would act consistently with his prior response to Eliades' request for approval of the March 16, 2002 fight – by approving the fight and sending someone to audit Eliades' records (Eliades 1st Aff. ¶ 5) – Burstein's prior acquiescence did not bind him to consent to the May 10 fight. Once Eliades knew that Burstein did not give his blessing, Eliades had the duty either to seek the Court's approval or to cancel the show.

[10] However, this Court strongly cautions Eliades that further violations, even if they fortuitously have profit-enhancing results, will be sanctioned.

7

'04/2004 20:43 FAX 212 974 2944    Case 1:06-cv-01509-HB-JCF    Document 50    Filed 02/21/2007    Page 27 of 32    Judd Burstein PC    ☑010

)3/04/2004 18:37 FAX 212 805 · ·1    JUDGE HAROLD BAER JR.    ☑009

5.    Mercedes Transfer to Ever Loukaides

Further, Lewis asserts that Eliades violated the February 15 Order when he transferred title to his Mercedes Benz to Ever Loukaides. Eliades claims that the transfer was effected on January 31, 2002 (Eliades 1st Aff. ¶¶ 32-38), while Lewis contends that the transfer occurred at a later date. Schalk Aff. ¶¶ 14-16. Similar to his defense with respect to the Parliament Hill Property, Eliades claims that while he officially transferred title to the automobile *after* the February 15 Order, he signed the paperwork for the transfer *prior* to the Order, on January 31, 2002 (Eliades 1st Aff. ¶ 10), after Loukaides paid Eliades £36,909.83 for the car. Id. ¶10. Eliades asserts that he finalized the transfer as soon as the English Courts vacated the World Wide Freeze Order that had been in effect. Eliades 1st Aff. ¶¶ 32-38. As explained earlier, because the February 15 Order is not entirely clear as to the effect of transactions entered into prior to the Order, that take effect after the Order, rather than hold Eliades in civil contempt with regard to an ambiguous provision, this Court has clarified the Order. *See supra,* footnote 5.

6.    Transfer of Interest in Treptos Investments

Lewis also asserts that Eliades violated the February 15 Order through his transfer of his interest in Treptos Investments ("Treptos") as security for a loan. Schalk Aff. ¶ 12. The only "evidence" that Lewis provides in support of his position is the mere supposition that because Lewis was in New York for the trial on February 6th, he would not have been able to effectuate the transfer. Schalk Aff. ¶ 18. In rebuttal, Eliades contends that the shares were transferred prior to the Order, on February 6, 2002, and therefore the transfer in no way violated the Order. Eliades 1st Aff. ¶¶ 11-12. In support, Eliades produced documentation, in the form of minutes from a Board of Directors Meeting held on February 6, 2002, in which Eliades participated by phone, which noted the transfer, and a Share Certificate executed on February 6th, which finalized the transfer. Eliades 1st Aff. Exh. 24. In reply, Lewis failed to provide any evidence to rebut Eliades' presentation, and therefore, failed to prove by clear and convincing evidence that, despite evidence to the contrary, Eliades' transfer actually pre-dated the February 15 Order. As a result, the Treptos transfer does not serve as a basis to hold Eliades in civil contempt.

7.    £11,000 Wire Transfer

Lewis also claims that an £11,000 wire transfer by Eliades to Switch Communications ("Switch"), on or after February 21, 2002, violated the February 15 Order. In defense, Eliades assets that he had previously issued a check to Switch, in the amount of £11,000, on February

8

'04/2004 20:43 FAX 212 974 2944   Case 1:06-cv-01509-HB-JCF   Document 50   Filed 02/21/2007   Page 28 of 32
Judd Burstein PC                                                                     ☒011

3/04/2004 18:38 FAX 212 805 7 .1         JUDGE HAROLD BAER JR.                        ☒010

14, 2002, but due to a bank error, the check was not paid until after the date of the Order, when
after discussions with Eliades' bookkeeper, the bank acknowledged its mistake, and agreed to
wire the payment directly to Switch. Eliades 1st Aff. ¶¶ 27-31, Exh. 20. Lewis provides no
evidence to the contrary to rebut Eliades' defense. Once again, this situation, akin to both the
Parliament Hill Property and the Repayment of the Loan to Barclays Bank, involves the post-
Order finalization of an event initiated pre-Order. As explained earlier, while Eliades *should
have* informed his bookkeeper about the strictures of the Order, and should have notified Lewis
or the Court about the chronology, Eliades' failure to do either is not a clear violation of the
Order. This Court finds it inappropriate to hold Eliades in civil contempt for what appears to be
a mistake on the part of the bank that caused a transaction not to reach fruition until after the date
of the Order.

8.    Production of Documents

Lewis asserts that Eliades failed in several regards to honor the February 25, 2002
deadline, set out in the February 15 Order for the production of "all books and records,
including, but not limited to, all banking records and third party contracts." In particular, Lewis
asserts that Eliades failed to disclose any documentation with regard to (a) a loan of £ 1.9 million
from Eliades' brother Christos, (b) a £ 500,000 flat which Eliades purchased for his son, (c) the
recent valuation of Panos Eliades Franklin & Co. at £ 300,000, (d) an investment of £ 450,000
and an additional £ 163,000 extension of credit to a company called Secondsout, (e) contact
information for his brother Christos, and (e) contact information for Mr. Kaissides. Burstein Aff.
¶¶ 19-22.

In response, Eliades asserts that he provided all of the documentation *in his possession*
for all of these transactions or inquiries or otherwise knew that Lewis already possessed the
information sought. Eliades 1st Aff. ¶ 50.[11] Although Lewis may read the Order otherwise, this

---

[11] With regard to the loan of £ 1.9 million, Eliades asserts and provides documentation to prove that he provided
Schalk with "a schedule of monies loaned by Managa Properties Limited...which was produced on the second day
of the UK deposition," and further asserts that he "was not in possession of" any other documents, which "could be
obtained direct from the company." Eliades 1st Aff. ¶ 50(a). With regard to the £ 500,000 flat that Eliades
purchased for his son, Eliades asserts and provides documentation to support that he produced documents relevant to
this purchase on the second day of the UK deposition and that while no further documentation was requested,
"Forbes Anderson were given during the UK world freeze trial a copy of the Land Certificate in respect of the flat."
Id. ¶ 50(b). Third, Eliades asserts not only that the recent valuation of £ 300,000 for Panos Eliades Franklin & Co.
represents unbilled work in progress that has not yet been documented, but also that he had already apprised
Burstein of this fact. Id. ¶ 50(c). Additionally, with regard to investments in Secondsout.com, Eliades asserts and
provides documentation to support that he produced relevant documents on the second day of his UK deposition. Id.

Court does not interpret the February 15 Order to require Eliades to produce documents, other than those in his possession. After all, the Order required Eliades to sign financial disclosures to allow Lewis access to materials that were not in Eliades' possession, but that were relevant to Lewis' inquiries. Further, Lewis' attempt at rebuttal is unsuccessful as (a) he fails to provide any evidence to support his claim that Eliades' deposition evidence is insufficient, and (b) his assertion that "it strains credulity" that Eliades would not have in his possession further documentation concerning these transactions does not suffice as clear and convincing evidence to the contrary. Burstein 1st Aff. ¶¶ 21-25. Therefore, these alleged discovery violations do not warrant a finding of civil contempt.

9.     Ownership of 39 Beech Hill Property .

    Lewis asserts, quite convincingly, that Eliades' perjury in his deposition testimony, with regard to conversations allegedly had with Aris Kaissides, or more accurately, Eliades' failure to volunteer to Lewis that Aris Kaissides had died on April 11, 2000, warrants a finding of contempt. There is no question that Kaissides was a relevant figure to this dispute as there was some confusion as to whether Eliades or Kaissides owned the parcel of property at 39 Beech Hill ("Beech Hill Property"). And, it is also apparent that during his deposition, Eliades relayed conversations that he professed to have had with Kaissides, on dates subsequent to Kaissides passing. However, the motivation behind what Lewis construes as Eliades' "lie," is hotly disputed. Lewis argues that Eliades wished to conceal his ownership of the Beech Hill Property, in order to shield this property from reach of the judgment. Burstein Aff. ¶¶ 7, 9. On the other hand, Eliades asserts that his failure to be forthcoming stemmed from his desire to shield, not the property, but rather the Kaissides family, during their time of grief, and further, to protect the Kaissides children from the investigators that Eliades contends had been following him. Eliades 2d. Aff. ¶¶ 115-118.[12]

¶ 50(d). Eliades also asserts and provides supportive documentation to show that he provided Burstein with the contact information for his brother Christos, on the second day of his UK depositions. Id. ¶ 50(e). Finally, Eliades asserts, albeit inferentially, that as evidenced by a letter from Boodle Hatfield, Kaissides' solicitors, to Lewis' UK attorneys, Forbes Anderson, Lewis should have known how to contact Kaissides, through his attorneys. While this last argument is certainly Eliades' weakest, as the fact that Lewis had an alternative means of obtaining Kaissides' contact information does not release Eliades from his obligation to produce the information, Eliades' argument makes clear that Lewis likely should not have requested information already in his possession, and makes civil contempt grounded on this withholding less supportable.

[12] Further, Eliades asserts that all conversations that he claimed to have had with Aris Kaissides did in fact occur at the times and places mentioned; however, the conversations were with other members of the Kaissides family – not with Aris. Burstein Aff. ¶ 4.

10

04/2004 20:44 FAX 212 974 2944    Judd Burstein PC    Filed 02/21/2007    Page 30 of 32
Case 1:06-cv-01509-HB-JCF    Document 50    ☑013

3/04/2004 18:39 FAX 212 805 7...    JUDGE HAROLD BAER JR.    ☑012

The civil contempt power is an extreme remedy and indeed a "potent weapon" (*Stein Indus., Inc., v. Jarco Indus., Inc.*, 33 F. Supp. 2d 163, 170 (E.D.N.Y. 1999), citing *Int'l Longshoremen's Assn. v. Philadelphia Marina Trade Assn.*, 389 U.S. 64, 76 (1967)), and therefore should not be utilized "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Stein*, 33 F. Supp. 2d at 170, citing *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885). Because Lewis has not provided clear and convincing evidence to support by a "reasonable certainty" that Eliades had an improper motive, there is still considerable doubt as to the wrongfulness of Eliades' conduct. Consequently, this Court finds it improper to hold Eliades in civil contempt for what may be described as his lack of candor with regard to Kaissides.

10.    Violations of the *Per Diem* and Transactional Spending Limits

Lewis alleges that Eliades' £40,000 payment to his lawyers violated the £3,500 transactional limit imposed by the Order. In defense, Eliades contends that the term "transaction," refers to individual purchases or checks drawn against an account. For example, Eliades argues that if £3,500 is withdrawn daily to finance an aggregate payment, there would be no violation of the £3,500 transaction limit. Eliades specifically made this argument with regard to his £40,000 payment to his UK lawyers, which he made in installment payments not exceeding £3,500. Eliades 3d. Aff. ¶¶2-3. Lewis asserts that this system violates the transactional limit because the total payment constitutes one transaction even though payments are made over a period of time. Notably, Eliades also made this argument in reference to the May 10 promotion. While the fact that an order is vague and indefinite as to whether a particular action is required or prohibited serves as a defense to contempt (*see Sacco*, 764 F. Supp. at 921), the Order is crystal clear on this point. The idea of a transactional limit is aimed to prevent exactly what Eliades did – spreading out one transaction over a period of time. The Court does not credit Eliades' theory as it is obviously contrary to both the spirit and the letter of the Order. As there is a £ 3,500 transactional spending limit in place, this payment of £ 40,000 amounts to a £36,500 violation of the Order.

Further Eliades concedes on several occasions to having violated the spending limits imposed by the February 15 Order, though he claims that these violations were "not willful" and were instead due to "administrative or clerical errors." Eliades 2d. Aff. ¶ 5. Unfortunately for Eliades, the contemptee need not be willful in his violations in order to be found in civil

11

contempt. See *Canterbury Belts Ltd. v. Lane Wlaker Rudkin, Ltd.,* 869 F.2d 34, 39 (2d Cir. 1989). Therefore, Eliades may be held in civil contempt for his alleged unintentional violations of the transactional limitations of the February 15 Order as listed below:

   a) February 22, 2002 excess expenditure of £1045.13 (Eliades 2d. Aff. ¶¶ 41-43);

   b) March 20, 2002 excess expenditure of £1000 (Eliades 2d. Aff. ¶¶ 50-51);

   c) March 22, 2002 excess expenditure of £1117.84 (Eliades 2d. Aff. ¶¶ 52-54);

   d) March 29, 2002 excess expenditure of £780.16 (Eliades 2d. Aff. ¶ 59); and

   e) April 29, 2002 excess expenditure of £389.22 (Eliades 2d. Aff. ¶ 74).

The purpose of the Order was to make funds available to satisfy the judgment against the Panix Parties. Further, the purpose of "civil contempt proceedings is remedial and compensatory..." *Upjohn Co. v. Medtron Labs., Inc.,* 894 F. Supp. 126, 135 (S.D.N.Y. 1995), citing *Sunbeam Corp. v. Golden Rule Appliance Co.,* 252 F.2d 467, 469 (2d Cir.1958); *Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir.1995) (stating that a civil contempt order is coercive rather than punitive in nature). Civil contempt is also utilized to ensure future compliance with an order. *See U.S. v. Paccione,* 975 F. Supp. 537, 544 (S.D.N.Y. 1997); *United Mine Workers,* 330 U.S. at 303-04. As explained *supra,* "[a] party may not be held in contempt unless the order violated by the contemnor is clear and unambiguous, the proof of non-compliance is clear and convincing, and the contemnor was not reasonably diligent in attempting to comply." *Local 638,* 81 F.3d at 1171. With regard to these expenditures, Eliades concedes that he violated the Order, and his excuse that these payments were "administrative oversights"[13] does not suffice as the sheer number of such oversights negates a finding of any sort of reasonable diligence. Therefore, the requirements for a coercive sanction have been met. "When imposing coercive sanctions, a court should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *New York Nat'l Org. for Women,* 886 F.2d at 1353. These considerations serve only to confirm the appropriateness of a sanction for these overt violations.

---

[13] Eliades' explanations for the *per diem* violations were as follows: (a) for the February 22, 2002 violation, "it would appear that there had been a slight violation of £1045.13 for this day," (b) March 20 and March 22, 2002, "this was an administrative oversight," and (c) March 29 and April 29, 2002 were claimed to be administrative oversights by his bookkeeper.

12

04/2004 20:45 FAX 212 974 2944    Judd Burstein PC    Case 1:06-cv-01509-HB-JCF    Document 50    Filed 02/21/2007    Page 32 of 32    ☑015

3/04/2004 18:40 FAX 212 805 7....    JUDGE HAROLD BAER JR.    ☑014

I am therefore imposing a fine of £40,832.35 – the total amount in excess of the *per diem* and transactional spending limits[14] – in order both to remedy the violations and ensure Panix Parties' compliance with the Order in the future. Eliades is to place this sum in escrow, within thirty days of the date this Order and Opinion is entered, earmarked for the satisfaction of the Judgment against Eliades, should the Judgment be affirmed on appeal.

As a result of my decision to impose civil sanctions, I deny the request to appoint an Assistant United States Attorney, or other private attorney, to initiate and prosecute criminal contempt proceedings against the Panix Parties. No finding warrants such serious action. *See Paccione*, 975 F. Supp. at 545, quoting *Spallone v. U.S.*, 493 U.S. 265, 276 (1990) ("the Supreme Court has made clear that 'in selecting contempt sanctions, a court is obliged to use the least possible power adequate to the end proposed.'").

### III. CONCLUSION

For the above stated reasons, the motion to hold Panix Parties in civil contempt is granted as to his violations of the Order's *per diem* and transactional spending limits, as discussed *supra*, Section II.B.10, and is denied with regard to all other alleged violations. Panix Parties collectively are ordered to place the sum of £40,832.35 in escrow, with the Clerk of this Court, no more than thirty days from the date hereof. The motion for criminal sanctions and to appoint a prosecutor are denied. The Clerk is requested to close this motion and any open motions and remove this case from my docket.

IT IS SO ORDERED.
New York, New York
March _____, 2004

_____
U.S.D.J.

---

[14] This court arrived at this sum by adding the amounts of the *per diem* spending limit violations (£4,332.35) to the £36,500 transactional violation.

13

# EXHIBIT F



Neutral Citation Number: [2005] EWHC 2966 (QB)

Case No: 05/TLQ/0768

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 20/12/2005

Before :

**MR JUSTICE NELSON**

- - - - - - - - - - - - - - - - - - - - - -

**Between :**

**(1) PANOS ELIADES**

**(2) PANIX PROMOTIONS LIMITED**

**(3) PANIX OF THE US INC.**

Claimants in the Inquiry into Damages/

Defendants in the Action

- and -

**LENNOX LEWIS**
Defendant in the Inquiry into Damages/
Claimant in the Action

- - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - -

Mr Mark Warwick (instructed by **Jeffrey Green Russell**) for the Claimants
Mr Ian Mill QC and Andrew Green (instructed by Forbes Anderson) for the Defendant

Hearing dates: Wednesday 5th October - Tuesday 11th October 2005, Friday 14th October 2005

- - - - - - - - - - - - - - - - - - - - - -

## Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

..................................

Eliades & ors v Lewis

Approved Judgment

**Mr Justice Nelson :**

1.  On 1 February 2002 Mr Justice McCombe discharged a Freezing Order which had been granted on 15 January 2002 by Mr Justice Pitchford to Mr Lennox Lewis against Panos Eliades, and Panix Promotions Limited and Panix of the US Inc. (The Panix companies). The order, which was by consent, required Mr Lewis to pay the costs of the application to discharge on an indemnity basis and further ordered that there should be "An inquiry as to any damages which the Claimant (Lennox Lewis) ought to pay to the Defendants (Panos Eliades, Panix Promotions Limited and Panix of the US Inc) pursuant to his undertaking in damages." It was this inquiry into damages which was the subject matter of the hearing before me.

2.  The Freezing Order was sought and obtained by Mr Lewis under section 25 of Civil Jurisdiction and Judgments Act 1982 in order to freeze the assets of Mr Eliades and Panix Promotions Limited and Panix of the US Inc prior to the hearing of legal proceedings between the parties which were due to commence on 1 February 2002 before a judge and jury in the State of New York in the United States of America. These proceedings arose out of the acrimonious termination of the business relationship between Mr Lewis and Mr Eliades. Between about 1991 and 2000, Mr Eliades and his associated companies Panix Promotions Limited and Panix of the US Inc managed and promoted Mr Lewis' career as a professional boxer. It was a highly successful relationship; by 2000 Mr Lewis held all four world heavyweight titles (WBC, IBF, WBA and IBO).

3.  The action in New York was commenced by Panix Promotions Limited and Panix of the US Inc against Mr Lewis in March 2001. The claim sought damages of some US $100 million on the basis that Mr Lewis had wrongfully terminated his contract in breach of an oral agreement, which it was alleged entitled Mr Eliades to a percentage of the net profits from Mr Lewis' bouts for the remainder of his professional career. The claim also sought payment of monies due.

4.  Mr Lewis denied the claims and counterclaimed some US $24 million for fraud, breach of fiduciary duty, breach of contract and racketeering under The Racketeer Influenced and Corrupt Organisations Act ('The RICO Act'). The damages sought for racketeering should, the counterclaim contended, be trebled pursuant to the RICO Act.

5.  The trial of the action took place in New York between 4 February and 14 February 2002 before Judge Baer and a jury. The jury gave their verdict in the form of answers to written questions posed for them by the Judge following discussions with the parties. They found in favour of Mr Lewis, finding Panix Promotions Limited and Panix of the US Inc, the New York claimants, and Panos Eliades, the New York third party defendant liable for (i) US $6,821,159 as damages for breach of fiduciary duty, (ii) US $56,400 damages for fraud, and (iii) US $396,082 as damages for violation of the RICO Act. The first and third findings were "on the preponderance of the evidence", the finding that Mr Lewis had been 'defrauded' by them was on "clear and convincing evidence". Judgment was entered in Mr Lewis' favour in the sum of US $7,273,641 on 15 March 2002 against Panix Promotions Limited, Panix of the US Inc, and Panos Eliades.

6.    On 15 February 2002 the New York Court granted a post judgment freezing order against Panix Promotions Limited, Panix of the US Inc and Panos Eliades which continued until 31 January 2003.

7.    On 1 August 2002 Mr Lewis obtained summary judgment in the High Court of Justice in London enforcing the New York judgment. Master Whitaker gave summary judgment to him in the sum of US $6,273,641 with interest to be assessed. This sum was the amount of the 15 March 2002 judgment in New York less the sum of US $1,000,000 which reflected an agreed set off in favour of Mr Eliades, Panix Promotions Limited and Panix of the US Inc for the sum in respect of monies due which they had recovered on their claim in the New York judgment. Mr Eliades appealed Master Whitaker's decision on the basis that the New York judgment, which automatically entitled the Claimant to treble damages for the RICO element of the award, was a judgment for multiple damages within the meaning of section 5 of the Protection of Trading Interests Act 1980 and was therefore wholly unenforceable. I heard that appeal and dismissed it having rejected the argument under the 1980 Act. The Court of Appeal dismissed an appeal against my judgment on 8 December 2003 save to the extent that the judgment was reduced by an agreed sum of US $396,082 as it was acknowledged on behalf of Mr Lewis that the whole of the RICO Act element was unenforceable. On 29 April 2004 the House of Lords dismissed a petition to appeal made by Mr Eliades and the Panix companies.

8.    Meanwhile in New York Mr Eliades and the Panix companies applied for an order that there should be a retrial of the New York action. One of their contentions was that their preparation of their defence to Mr Lewis' counterclaim had been prejudiced by the freezing order of 15 January 2002. That motion was denied by an order dated 3 June 2002. The final appeal against the New York judgment by Mr Eliades and the Panix companies was rejected on 26 October 2004 by the United States Court of Appeals for the Second Circuit. The New York judgment and its enforcement in the United Kingdom therefore stands. The New York jury's findings of breach of fiduciary duty, fraud and racketeering and their rejection of Mr Eliades' evidence that there had been an oral agreement with Mr Lewis that the Panix companies were entitled to a percentage of the net profits from Mr Lewis' bouts for the remainder of his professional career, were made after they had considered the depositions and heard evidence at the trial both from Mr Eliades and Mr Lewis.

## The Freezing Order.

9.    The order obtained from Mr Justice Pitchford on 15 January 2002 was a without notice, worldwide freezing injunction. It froze the assets of Mr Eliades' and the Panix companies and any money held on account by Jay Goldberg, counsel for Mr Eliades in the New York action and by BDO Stoy Hayward, Mr Eliades expert accountancy witness in the New York action. The order permitted Mr Eliades to spend £1,000 per week towards his ordinary living expenses and did not prevent him or Panix Promotions Limited or Panix of the US Inc from spending a reasonable sum on legal advice and representation. Nor did the order prohibit Panix Promotions Limited or Panix of the US Inc from disposing of any of its assets in the ordinary and proper course of business. Schedule C to the order identified some twenty properties described by Mr Lewis' New York lawyer, Judd Burstein, as assets of which he was aware, or in which "he believed," as a result of the investigation work carried out by Decision Strategies (UK) Limited, "the Respondents might have an interest". The

Approved Judgment

injunction was served upon some 64 individuals and entities. The letter sent out to the recipients, by error, implied that the recipients were parties to the case in which the injunction was granted.

10.     After the freezing order had been obtained Mr Judd Burstein gave interviews to the Daily Mail's sports journalist, Charles Sale and to a website entitled Fightnews.com. He informed the journalists of the freezing order and was quoted in the Daily Mail article of 17 January 2002 as saying "We don't believe Panos doesn't have any money, but he now has to give a full affidavit to the Court explaining where every dollar is." Mr Eliades was quoted as saying that his businesses would grind to halt as a result of the order and someone would have to pay for the damage done to them. The Fightnews.com entry recited the first page of the order stating that if it was disobeyed Mr Eliades or the Panix companies may be held in contempt of court, liable to imprisonment or have their assets seized. Fightnews.com was a leading boxing website and information on it would become widely known within the boxing world.

11.     The order contained the usual undertakings as to damages given by Mr Lewis. Those undertakings were continued before Mr Justice Gibbs on 25 January 2002 when he ordered that the freezing order continue in force until the hearing of the application to discharge it took place on the day fixed to be the appropriate hearing date namely 30 January 2002.

12.     It was asserted before Mr Justice McCombe on 30 January 2002 that the injunction had been wrongly granted to Mr Lewis. It was submitted that he had not provided a case for fearing improper dissipation, that it was not expedient for the injunction to remain in place given the pending hearing of the New York trial, that Mr Lewis had failed to make full and frank disclosure to the Court, that his US Attorney's conduct amounted to an abuse, and that there was a very real probability that the order had caused severe and disproportionate hardship to Mr Eliades and the Panix companies. (See written submissions 29.1.2002 on behalf of Mr Eliades and the Panix companies by their counsel Thomas Lowe).

13.     During the course of the hearing Mr Justice McCombe voiced concerns that the application was tactical in its scope and use of the freezing injunction procedure. On the morning of the third day, after the written evidence had been considered by the Judge, there being no oral evidence called, but before final submissions had been made on behalf of Mr Lewis, the application to continue the injunction was discontinued. The parties agreed by consent that the injunction be discharged and that Mr Lewis should pay the Panix companies and Mr Eliades the costs of the application on an indemnity basis and that there should be an enquiry as to damages. The Judge also ordered Mr Lewis to file a claim form setting out the relief sought, which claim was then dismissed.

14.     Unusually, where a consent order has been agreed, Mr Justice McCombe gave a short judgment emphasising the extreme caution required on the part of members of the legal profession in this country when invited to prepare and present applications in aid of foreign proceedings under the 1982 Act. He said in his judgment that on reading the papers an immediate concern arose in his mind as to whether the application might be a tactical one, calculated to disrupt the Defendants' preparation for the New York trial. In the course of argument he said that it emerged that virtually all the information relied upon by Mr Lewis, deposed to by his New York lawyer, rather than

Approved Judgment

himself, turned out to have been known by that lawyer for many months and at least since November last year. The only new piece of information, which had a substantial impact on Mr Justice Pitchford, was probably based upon an inaccurate interpretation of answers given in the oral deposition in New York, without regard to other written information that was available.

15.    The Judge criticised the fact that the list of identified properties contained several real or leasehold properties and a bank account, in the name of third parties rather than in the name of any Defendant, and that the evidence supporting the inclusion of such properties on the basis that they might be beneficially owned by the Defendant turned out to be "either flimsy or non-existent". The judge noted that as a consequence of the erroneous use of a letter heading several persons in the First Defendant's family's social or business circle were effectively informed that the Court order affected property registered in their name giving them concerns for their personal position. The Judge stated that he had been minded, before the application was abandoned, to dismiss the application simply on the basis that the procedure had been abused by the apparent unjustified inclusion of many of those properties in the Schedule.

16.    The injunction had therefore been in place for some seventeen and a half days at the time of its discharge on 1 February 2002.

### The claim for damages.

17.    Mr Eliades and the Panix companies made the application for an inquiry as to damages on 9 November 2004, some 2 years and 9 months after Mr Justice McCombe had ordered an inquiry as to damages and some fourteen days after the final dismissal of their appeal against the New York judgment in the United States.

18.    The claim is for damages for past and future losses (subject to the question of election) in relation to three boxers, Vassiliy Jirov, Travis Simms and James Toney. Mr Eliades through the Panix companies and Championship Boxing Limited (CBL) a dormant company used by him for boxing contracts and alleged to be part of the Panix business, was promoter for Mr Jirov, manager of Mr Simms and claims a contingent relationship with Mr Toney under a future bouts agreement between him and Panix of the US Inc.

19.    At the time of the injunction bouts had been arranged for both Mr Simms, and Mr Jirov. Mr Simms' bout took place on 31 January 2002 and Mr Jirov's bout, which was a mandatory defence of his world title, was arranged for 1 February 2002. It is contended that the preparations for these two boxing matches were so disrupted by the freezing order that Messrs Simms and Jirov determined their contracts with the Panix companies and went elsewhere. The freezing order prevented Mr Eliades attending in order to promote the Jirov bout and prevented him from paying the boxers' purse; as far as Mr Simms was concerned the freezing order prevented the payment of the money required for his bout, namely his and his opponent's purses. Although both bouts did in fact go ahead and Mr Simms and Mr Jirov both won, the boxers' confidence and trust in Mr Eliades was broken and they terminated their contracts with his companies.

20.    As a consequence it is contended that Mr Elaides and the Panix companies lost US ~~dollars~~ of US $1,406,000 future loss in relation to Jirov, US $303,181 past

loss or US $1.475M future loss in relation to Mr Simms and US $7,500 past loss or US $2.625M future loss in relation to Mr Toney. Mr Eliades and his companies, it is alleged, would have had a four bout agreement with Mr Toney as the future bouts agreement between him and Panix of the US Inc had been triggered by his defeat of Jirov in April 2003, when Mr Eliades and his companies should still have been Jirov's promoter, had it not been for the freezing order. In each case future losses are sought based on speculative projections as to what bouts would have been fought by each boxer had Mr Eliades remained their manager, which they would have won and how much would have been earned from the contract with them.

21.    The essence of the claim for damages by Mr Eliades and the Panix companies is that the wrongful obtaining of the freezing injunction, applied for by Mr Burstein with the intention of disrupting Mr Eliades' preparation for the New York trial or reckless as to whether it might be disruptive, caused turmoil in Mr Eliades' life. Instead of being able to prepare for the New York trial and deal with other matters he had to return to London and instruct English lawyers to make an application to discharge the freezing injunction. He had to comply with the draconian provision of informing Mr Lewis in writing, at once, of all his assets and find funds to instruct his English lawyers even though his assets were frozen. It was inevitable that his focus was on the discharge of the injunction. The emotional and physical demands upon his time made it difficult for him to deal with any other matters and when he was able to do so after the injunction had been discharged his priority had to be dealing with the pending New York trial. Thus Mr Eliades said in evidence "If anybody in this room is ever faced with a freezing order, I actually would like to see them stand up and tell me how they survive it. It is a shocking experience." It was that severe disruption which caused him to lose his relationship as either promoter or manager with Mr Jirov and Mr Simms.

22.    Mr Lewis contends that the Court now knows that Mr Lewis had a good arguable case not merely on breach of fiduciary duty but also fraud and that the evidence is abundantly clear that Mr Eliades was hiding his assets in order to avoid having to satisfy any judgment which Mr Lewis obtained. These matters together with dishonest evidence by Mr Eliades before Mr Justice McCombe, Mr Justice Peter Smith, and this Court, should lead the Court to refuse to enforce the undertaking as to damages. In any event causation has not been established and there has been a serious failure to mitigate any loss suffered.

23.    The reference to Mr Justice Peter Smith is a reference to a hearing before him in March 2005 when he decided that a property known as 39 Beech Hill, Enfield, which Mr Eliades denied was owned by him, was in fact owned by him and that in the course of his evidence he had lied in order to frustrate any investigation into his financial affairs. Permission to appeal that decision has been given to the administrators of the estate of the late Mr Aristos Kaissides who was said by them and by Mr Eliades to be the true owner of 39 Beech Hill, but Mr Eliades was refused leave to appeal. That appeal is, I am informed, to be heard on 14 December 2005.

## The Issues.

24.    The parties are agreed that there are two issues for the Court to consider, firstly whether the Court should in its discretion enforce the undertaking and secondly, what damages have been established if the undertaking is to be enforced. There is however no agreement as to how the Court should approach the exercise of its discretion. Mr

Approved Judgment

Lewis submits that in performing this task the Court must determine whether the injunction was wrongly granted, as if it was not it is inconceivable that the Court would nevertheless enforce the undertaking. Mr Eliades and the Panix companies however submit that the issue of whether the injunction was wrongly granted has already been determined by Mr Justice McCombe and cannot be revisited by this Court either because it is res judicata or because of estoppel. As a consequence, it is submitted, the evidence before me from Mr Judd Burstein is only relevant to the issue of his motive in making the application, namely whether there was intent to disrupt Mr Eliades' preparation for the New York trial or whether there was recklessness as to the risk of disruption, and is not relevant as to whether the injunction was wrongly granted. I shall set out my approach to the matter when considering the law under the next section in this judgment.

## The Law.

25. (i) **Discretion.**

An undertaking as to damages is given to the Court, not to the party against whom the freezing order is obtained. The Court exacts the undertaking for the Defendant's benefit as a basic protection for relief granted without notice. The presence of such an undertaking ensures compliance with ECHR (see *Gee, Commercial Injunctions 5th Edition para 8.001 footnote 1.*) Once it is established that the injunction was wrongly granted, even without fault on the applicant's part, the Court will ordinarily order an enquiry as to damages. The Court however has a discretion as to whether to enforce the undertaking. That discretion has to be exercised by reference to all the circumstances of the case, bearing in mind that since the injunction should not have been obtained, prima facie the party who wrongly obtained the injunction ought to bear the loss.

26. In *Graham v Campbell [1877] 7 Chancery Division 490* Lord Justice James said that the undertaking as to damages... "is one to which (unless under special circumstances) effect ought to be given."

27. In *Hoffmann-LaRoche & Co v Secretary of State for Trade and Industry [1975] AC 295, at 361,* Lord Diplock said that the Court:-

> "Retains a discretion not to enforce the undertaking if it considers that the conduct of the Defendant in relation to the obtaining or continuing of the injunction or the enforcement of the undertaking makes it inequitable to do so..."

28. In *Financiera Avenida S.A. v Shiblaq The Times 14 January 1991* Lord Justice Lloyd said:-

> "Two questions arise whenever there is an application by a Defendant to enforce a cross undertaking in damages. The first question is whether the undertaking ought to be enforced at all. This depends on the circumstances in which the injunction was obtained, the success or otherwise of the Plaintiff at trial, the subsequent conduct of the Defendant and all the other circumstances of the case. It is essentially a question of

BLACKSTONE

20/12 2003 09:48 FAX 02078227351

Approved Judgment

discretion. The discretion is usually exercised by the trial judge since he is bound to know more of the facts of the case than any one else. If the first question is answered in favour of the Defendant, the second question is whether the Defendant has suffered any damage by reason of the granting of the injunction."

29.   There must be, as Mr Mark Warwick on behalf of Mr Eliades and the Panix companies submits, a link between the Defendant's conduct and the obtaining or continuing of the injunction or the enforcement of the undertaking. Outrageous or dishonest conduct in itself and not so linked will not suffice. *Universal Thermo Sensors Limited v Hibben [1992] 1 WLR 840*. As the Vice Chancellor said in that case where the Defendant's conduct was undoubtedly outrageous and dishonest:-

"Punishment of the Defendants is not my function. If the Defendants have suffered material loss by reason of excessive width in the terms of the injunction sought and obtained by the plaintiff... in my view they are entitled to look to the plaintiff for damages pursuant to its undertaking. Plaintiffs, and those who advise them, know or ought to know that there is a risk in obtaining interlocutory injunctive relief: the risk is that the plaintiff may have to pay compensation to the Defendant if it turns out at the trial that, having regard to the facts and law as established at the trial, the effect of the injunction was to restrain a Defendant from activities it ought to have been at liberty to pursue." (857H)

30.   Mr Ian Mill QC on behalf of Mr Lewis relies upon a passage in *Gee, Commercial Injunctions 5th Edition para 11.021* where it is said:-

"In considering whether to enforce the undertaking in damages, two of the important factors are whether the claimant has succeeded on the merit of his claim, and whether there was a real risk of dissipation of assets. If the discretion is being exercised after judgment, then if the claimant has succeeded in his claim and there was a real risk of dissipation then ordinarily the Court will not enforce the undertaking: *Armhouse Lee Limited v Anthony Chappell Court of Appeal transcript number 1507 of 1994*, where the Defendant unsuccessfully sought enforcement because part of the evidence used on the ex parte application had been perjured, although the plaintiff and its advisors did not know this and had not been at fault in using it on the hearing of the application."

31.   Mr Warwick submitted that Mr Lewis was not entitled to rely upon the case of *Armhouse* as it did not fulfil the specified requirements of the Practice Direction (Citation of Authorities) 2001 1 WLR 1001 applicable, inter alia, to judgments on applications for permission to appeal or attended by one party only. Unless such a case established a new principle or extended the present law it may not be cited before any court under paragraph 6.1 of the Practice Direction. *Armhouse* was clearly such a case and accordingly should not have been put before me, Mr Warwick submitted.

20/12 2005 09:49 FAX 020782275    BLACKSTONE    ⬜010/034

32.    The Practice Direction is aimed at preventing the courts being burdened with a weight of inappropriate and unnecessary authorities which, because of their nature may be limited in their value. Where however an eminent textbook upon a subject sets out a proposition and cites an authority for it, it is perfectly proper for such an authority to be bought to the attention of the court even though it may fall foul, on its face, of the Practice Direction. I have taken into account the fact that the decision in *Armhouse* was an application with only one party present, that arguments and the law were not therefore fully developed and it accordingly suffers from these limitations. It should however be noted that if *Armhouse* does extend the law then it would on that ground alone be within the Practice Direction.

33.    Mr Warwick submits that the Court should jealously guard its discretion to refuse to enforce an undertaking as to damages. Such an undertaking is a fundamental protection for a party wrongly injuncted and where, as here Mr Lewis has admitted by agreeing to Mr Justice McCombe's order that the injunction was wrongly granted, Mr Eliades and the Panix companies should not be denied the opportunity to claim damages. Such a denial would be to nullify the purpose of the undertaking as to damages. The obligation to provide full and frank disclosure in making an application for a freezing order is paramount. In *Bank Mellat v Nikeour [1985] FSR 87* Lord Justice Donaldson referred to the Mareva injunction, together with the Anton Piller order, as being the laws' two "nuclear weapons". He said that "If access to such a weapon is obtained without the fullest and frankest disclosure, I have no doubt at all that it should be revoked."

34.    The need for the Court to take a rigorous view and require full and frank disclosure of all material facts, whether or not the non disclosure is innocent, was emphasised in *Behbehani v Salem [1987] 1 WLR 723*. Lord Justice Woolf said:-

> "..there is considerable public interest in the Court ensuring that full disclosure is made on ex parte applications of this sort. If it is to be sufficient to outweigh that public interest to point to the harm that could befall plaintiffs if an injunction is not regranted, then the whole policy which has been adopted by the Court in this field in my view would be undermined. Injunctions in the nature of Mareva and Anton Piller orders should not be granted unless the plaintiff can show a substantial case for saying that unless they are granted they will be under serious risk of assets which might otherwise be available to meet the judgment being dissipated or evidence which might otherwise be available disappearing."

35.    The Judge in that case had balanced out the risk of dissipation of assets against a misguided decision not to disclose. Lord Justice Woolf said that it could not be sufficient to carry out such a balancing exercise. He nevertheless said in a passage relied upon by Mr Mill at page 729 that:-

> "In deciding in a case where there has undoubtedly been non disclosure whether or not there should be a discharge of an existing injunction and a regrant of fresh injunctions, it is most important that the Court assesses the degree and extent of the culpability with regard to the non disclosure, and the

20/11 2003 00:45 FAX  9201022133         BLACKSTONE                        @011/034

importance and significance to the outcome of the application for an injunction of the matters which were not disclosed to the Court."

36.    The Court of Appeal emphasised in *Brinks Mat Limited v Elcombe [1988] 1 WLR 1350* that the strict rules on full disclosure, for which there are sound public policy reasons, should not be operated as an instrument of injustice. The court has a discretion to continue an injunction, or grant a fresh one, even where there has been non-disclosure.

37.    Mr Judd Burstein failed in various respects to fulfil the obligation of full and frank disclosure, and this conduct should be taken into account in dealing with issue of discretion Mr Warwick submits. The more serious the defects the less willing the Court should be to release Mr Lewis from his cross undertaking on damages as to do so would be to exempt him from all and any consequences of the injunction. In any event it is submitted on behalf of Mr Eliades and the Panix companies that the disruption likely to be caused to the New York proceedings was a strong contra indication to an injunction being granted only some weeks before the trial. In *Credit Suisse v Cuoghi [1998] QB 818* Lord Bingham said that it would obviously weigh heavily, probably conclusively, against the grant of interim relief if such grant would obstruct or hamper the management of the case by the Court seized of the substantive proceedings. Mr Warwick submits that this was the case here.

38.    On the basis of the authorities and submissions put before me I conclude that the injunction must have been wrongly granted or wider in its scope than it should have been before the party against whom it was granted can recover damages. He must have been restrained by the terms of the injunction from doing something that he should have been entitled to do (*Hoffman La-Roche at 361*) or, "the effect of the injunction was to restrain a defendant from activities it ought to have been at liberty to pursue." *Universal Thermo Sensor 857*.

39.    It is therefore necessary for the Court considering whether an undertaking as to damages should be enforced, to determine whether the injunction was wrongly granted or not. I do not consider that that issue was finally determined by the discharge of the injunction by consent on 1 February 2002 by Mr Justice McCombe. That decision was not a final judgment on the merits, final submissions had not been made to the Court when the application was discontinued and no oral evidence was heard by Mr Justice McCombe. In these circumstances res judicata does not arise and Mr Lewis is not in my judgment estopped from raising the issue as to whether the injunction was wrongly granted. The discontinuance of the application and the agreement to the discharge of the order at that time was not a concession that the injunction had been wrongly granted. Where, as here, it is agreed between the parties that the question of discretion remains to be determined even though the enquiry was ordered at an earlier date, the Court must exercise that discretion upon the basis of the facts known at the time it is to be exercised.

40.    Thus the fact that Mr Lewis succeeded at the trial in New York, and the fact that Mr Eliades was found by Mr Justice Peter Smith to have sought to frustrate any investigation into his financial affairs are matters which the Court should be able to consider. As the Vice Chancellor said in *Universal Thermo Sensors Limited* the question of whether the effect of an injunction was to restrain a defendant from

activities it ought to have been at liberty to pursue is determined having regard to the facts and law as established at the trial. Further, Lord Justice Lloyd in *Financiera Avenida S.A.* stated that the question of whether the undertaking ought to be enforced at all depended on "the circumstances in which the injunction was obtained, the success or otherwise of the plaintiff at the trial, the subsequent conduct of the defendant and all the other circumstances of the case". See *Balkanbank v Taher [1995] 1 WLR 1064* where the passage is cited by Lord Justice Beldam.

41.     It falls to me to determine on the evidence I have heard the degree and extent of the culpability of the non disclosure by Mr Burstein and the importance and significance of the matters which were not disclosed to the exercise of my discretion. I have heard the evidence from Mr Burstein and full argument about his conduct from both sides. It would be wholly artificial if, as Mr Warwick submits, I should be bound by what Mr Justice McCombe said in 2002 when he had not had the advantage of hearing such evidence and argument. The fact that Mr Justice McCombe did not decide the case on the merits but only commented on the issue of non disclosure does not assist Mr Warwick's argument. It is this Court which has to exercise the discretion on the facts now known.

42.     Even if I am incorrect in concluding that I should determine whether or not the injunction was wrongly granted, the exercise of my discretion nevertheless obliges me to take into account all the circumstances in order to determine whether it would be inequitable to enforce the undertaking. The phrase "special circumstances" used in *Graham v Campbell* and repeated in *Bowling & Co (Insurance) Limited v Corsi Partners Limited [1994] 2 Lloyds R 567* means in my judgment no more than the test set out by Lord Diplock in *Hoffman La-Roche*, namely whether the conduct of the defendant in relation to the obtaining or continuing of the injunction or the enforcement of the undertaking makes it inequitable to enforce that undertaking. I must therefore in considering the relevant circumstances assess the material now in front of me in order to be able to exercise my discretion.

43.     I propose, in the exercise of this discretion to consider the outcome of the trial in New York, Mr Eliades' conduct in the New York trial, in the application to discharge before Mr Justice McCombe, at the hearing before Mr Justice Peter Smith, at the hearing before me, the defects in evidence and disclosure by Mr Burstein, and Mr Burstein's motive in making the application. I will consider this conduct in so far as it is relevant to the obtaining or continuing of the injunction or the enforcement of the undertaking. I am satisfied that all these matters are covered in the pleadings, that Mr Eliades and his legal advisers had notice of them from the contents of the reamended defence in the Inquiry and that they in any event form an essential part of my consideration of the issue of discretion.

44.     **(ii) Damages**

Once the undertaking as to damages is to be enforced the measure of damages payable under it is not discretionary. The ordinary principles of the law of contract apply both as to causation and to quantum. (*Hoffman La-Roche 361* and *Balanbank* citing *Financiera Avenida S.A. 1064*). Thus the ordinary rules as to causation, remoteness and mitigation apply.

**1    The exercise of the Court's discretion.**

45.    In order to perform this task the Court must, in my judgment, consider the substantive merits of the case for a freezing order on the information now known. This forms part of the task of ascertaining whether there are special circumstances which would render it inequitable to enforce the undertaking. It is also necessary to consider the conduct of both parties. The situation must be looked at in the round.

**(i) The merits of the claim**

46.    The Judgment on the counterclaim in favour of Lennox Lewis establishes that he had a good arguable case on the merits. The verdict of the jury includes a finding of fraud against Mr Eliades in respect of which US $56,400 damages were awarded against him. This finding, although significant, does not, as Mr Warwick submits, establish as a matter of law either that the injunction was properly granted or that there was an intention to dissipate assets. It may however be said to increase the risk of such dissipation; a man found to be prepared to defraud his principal may also be prepared to avoid the consequences of his fraud, namely having to pay a judgment obtained against him for that fraud, by other dishonest means such as disposing of or hiding his assets. It remains essential however for the Court to scrutinize not only the dishonesty to see whether an inference of dissipation is justified, but also all the other facts to see whether they justify such a finding. I will consider Mr Warwick's submission that the merits cannot legitimise an improperly obtained injunction later in this judgment.

**(ii) The risk of the dissipation of assets.**

47.    Mr Burstein asserted in his first affidavit before Mr Justice McCombe that Mr Eliades claimed in his deposition evidence that he was essentially bankrupt. The reason for this assertion was that neither the Panix companies nor Mr Eliades' insolvency company, Eliades Franklin & Company, had any liquid assets, that he was in debt to the bank to the extent of £750,000 and had borrowed £1.5M from his brother. He had said that his line of credit was secured by one of his properties. Mr Burstein told me in evidence that even when the approximate value of the two properties which Mr Eliades accepted that he owned, namely 84 Green Lanes, London N16 and 24 Parliament Hill, London NW3, were taken into account there still appeared to be an indebtedness of £750,000 which he said he regarded as essentially bankrupt in the sense that he was "underwater so to speak" to the tune of £750,000. (Day 5 p 715)

48.    Mr Burstein also relied upon the fact that in October 2000 Mr Eliades had said that his assets were in excess of US $6M which demonstrated a dramatic financial decline over the fifteen months between October 2000 and January 2002. Mr Lewis' purses amounted to some US $70M during the time that Mr Eliades was his general manager. Mr Eliades was entitled to 30% of those purses but said in evidence that after expenses the figure worked out at US $5,467,000. (Day 3 475). When he was asked how much profit he had made on the promotions as opposed to his percentage of the purses he said he was unable to give any figure off the top of his head, but accepted that "we are talking about millions. We are not talking about 200,000." His guestimate was "A couple of million". (Day 3 477, 478). Mr Eliades told me in evidence that none of his companies had paid tax on the earnings he received from Mr Lewis and that the Inland Revenue are awaiting the outcome of this action.

49. Mr Eliades denied in his affidavit evidence before Mr Justice McCombe that he had said that he was bankrupt. All that he had said was that he had no positive bank balances. The reason for the decline in his financial position was essentially his expenditure on the New York litigation which had been some US $1.5M.

50. Mr Eliades placed his contracts with boxers in a dormant company with no bank accounts and no assets, entitled Championship Boxing Limited. The sole shareholders of this company were two employees of Panix Promotions Limited, Mr Loukaides and Mr Tomasino. Mr Eliades said that those shares were held in trust for him or Panix Promotions Limited but there was nothing in writing to this effect with Mr Loukaides and Mr Tomasino. Nor did he recall on whose behalf he had asked them to hold the shares. It was said that they were held as a nominee for him in his pleadings but he said that on reflection, as the monies were paid through Panix Promotions Limited, he believed the shares were held in trust for that company. His uncertainty on this issue can be seen from his evidence on the matter at Day 3 p 400, 401. Mr Eliades told me that he placed the boxing contracts into CBL for the purpose of 'cleaner housekeeping' in order to separate out the boxing contracts from other business matters. CBL consented to judgment when Mr Jirov brought proceedings for his unpaid purse against it in America but that judgment has not been paid.

51. Another instance of shares being held as nominee is the investment in a company called seconds out.com. Those investments were made in Mr Eliades' personal name but held by him as Panix's nominee. He accepted that the shares should have been in Panix's name as Panix had paid for them but said the company, not him, was responsible for issuing the shares and that there was no reason at all why he had not asked for them to be issued in the name of Panix.

52. Mr Eliades is a chartered accountant but has lost his right to practise as such because the Institute claimed that he had failed to pay his membership dues when they fell due on 1 April 2001. He disputed this but did not pursue the matter as he did not consider the Institute well disposed to him. He has also lost his licence as an insolvency practitioner after he had been wrongly charged with criminal offences which were later withdrawn. He had earlier been reprimanded on three disciplinary charges in 1999 and the same number in 2000. He continues to practise as a consultant in his insolvency practice Panos Eliades Franklin & Company. That company receives parts of its income in cash.

53. I turn now to consider those parts of Mr Eliades' evidence which are relevant to the issue of the risk of dissipation.

### (a) The intended transfer of 75% of the shares in Panix Promotions Limited to Mr Lewis.

54. In the course of his deposition in New York in November 2001 Mr Eliades said that he told Mr Lewis in about 1999 that he was having a problem with his wife and was going to transfer 75% of shares in Panix Promotions Limited to Mr Lewis to hold in trust for Mr Eliades in the event that his wife sought to gain assets from him in a divorce situation or a separation situation. Mr Lewis knew of this and approved it. The shares were never in fact transferred as Mr Eliades and his wife became reconciled but the records at Companies House did indicate that Mr Lewis had such an interest in the company. (The records at 19 January 2000 show a transfer on 25

BLACKSTONE

February 1999, and at 1 March 2000 a retransfer back, from Mr Lewis.) These answers were elicited in cross-examination by Mr English. Later, in the same deposition Mr Burstein put to Mr Eliades that he was in effect hiding assets from his wife. Mr Eliades said that that was not the purpose, he was protecting assets. He did not wish his wife to be able to control the company. The last thing he wanted, if it got acrimonious, was for the shares to be split 50 – 50 and then he would have to deal on the board of directors level with an angry shareholder or director "so that they couldn't get motions passed". He accepted that he was still the true owner of Panix Promotions Limited but should litigation result between him and his wife he wanted to be able to claim in court that Mr Lewis owned 75%.

55.     In answer to questions from me Mr Eliades confirmed that although the company records showed Mr Lewis had an interest in 75% of the shares in the company he did not in fact have such an interest. Nevertheless Mr Eliades accepted that had the matter gone to court he was prepared to say that Mr Lewis did in fact own 75%; in other words he would have given an untruthful answer in order to protect the control of the company, though not he said for the purposes of hiding assets. (Day 4 p557).

56.     This clearly demonstrates the Mr Eliades is a man who is prepared to lie on oath if it suits his purpose in order to protect his interests or that of his company. Furthermore, the answers establish a preparedness to transfer assets to someone else or untruthfully assert that they had been transferred so as to ensure that a claim made by a third party might be defeated. Mr Eliades' purpose may have been to protect the control of his company but the transfer or purported transfer was clearly a concealing of assets whatever its purpose might have been. This in my judgment is relevant to the risk of dissipation.

57.     Mr Lewis told me that Mr Eliades' evidence that he had been informed of the transfer or the purported transfer and approved it was untrue. He was not cross-examined on this. Mr Burstein said that he had heard from Mr Lewis' agent, though not from Mr Lewis himself, that a conversation about a transfer of shares had taken place, albeit not its purpose, and had included that in a Court document in the New York proceedings but withdrawn it when he had later discovered from Mr Lewis it was untrue. Mr Lewis told me that the first time he had discovered that he was said to own shares in Panix Promotions Limited was when his accountants discovered it in the company records. Mr Lewis gave his evidence in a calm collected and impressive manner. I accept his account and conclude that Mr Eliades was not giving me an accurate account of what transpired.

58.     **(b) 39 Beech Hill**

Mr Eliades denied that he owned this property and asserted that it had been owned by Mr Kaissides. Mr Lewis sought a declaration in the Chancery Division that Mr Eliades was the true beneficial owner of the property and that the Second and Third Defendants in that action as administrators of the estate of Mr Kaissides who had died in April 2000, held the property on trust for him. Mr Justice Peter Smith found in favour of Mr Lewis. In the course of his judgment he concluded that Mr Eliades was being evasive:-

"..because he had by the time the New York action had been lost no significant assets with which to satisfy judgment. He

BLACKSTONE                                                     ☒016/034

well knew that he was likely to be subject to prolonged and detailed investigation into his affairs and dealings with family and friends as a result. The lies in my view are designed to frustrate any investigation into the financial affairs of Mr Panos Eliades and those associated or related to him. This shows in my view, that Mr Panos Eliades is a man who is willing to lie if it suits his purpose." (Lennox Lewis and Panos Eliades and Ntinos Karias and Claire Kaissides [2005] EWHC 488 (Ch) para 47).

59.    It follows that as far as Mr Eliades is concerned he lied to Mr Justice McCombe in his affidavits as to the ownership of 39 Beech Hill.

60.    Mr Justice Peter Smith's judgment, as I have indicated earlier, is subject to an imminent appeal by the personal representatives of Mr Kaissides. In paragraphs 44, 45 and 46 Mr Justice Peter Smith sets out the admitted lies which Mr Eliades had made in the New York proceedings. It follows that he also lied in relation to these matters in his evidence to Mr Justice McCombe. He lied firstly about Mr Kaissides, describing him as being alive when in fact he was dead and secondly about the relationship between him and Mr Kaissides saying that he was his wife's friend when in fact he was his own cousin.

61.    Mr Eliades stated in his deposition in New York that Mr Kaissides had told him that he wanted Mr Lewis out of the property and narrated the details of a conversation he had with Mr Kaissides in February 2001 in which he explained he was having trouble with Mr Lewis and how he wanted the house back. In his deposition of 10th January 2002 Mr Eliades said that Mr Kaissides was absolutely livid about the rent not being paid. In a further deposition of 26 February 2002 he said he had spoken to Mr Kaissides in April 2001 and Christmas of that year about Mr Lewis' failure to pay the rent. As Mr Justice Peter Smith said, all that was untrue because Mr Kaissides had died on 11 April 2000.

62.    The reason given by Mr Eliades both to me and to Mr Justice Peter Smith for these admitted lies was a concern that relatives and friends should not be further harried or hassled by private detectives or other such investigators, instructed on behalf of Mr Lewis, operating with excessive zeal and meanness. Mr Eliades contends that Mr Justice Peter Smith's reasons for rejecting this account were incorrect, firstly because his description of there only being vague evidence about family or friends being harried or hassled was inaccurate and secondly the Judge's findings as to timing were inaccurate in that he wrongly held that the lies pre-dated the complaints. These are matters which will no doubt be dealt with by the Court of Appeal but for my part I found Mr Eliades' evidence upon this issue to be unconvincing irrespective of the dates. What protection from harassment would friends or relatives be given by Mr Eliades saying that Mr Kaissides was his wife's friend rather than his own cousin? How would lies about Mr Kaissides being alive when in fact he was dead protect his family or Mr Eliades' family? The lies would not, as far as Mr Eliades could know, discourage further enquiries, and if and when the truth was disclosed then more detailed enquiries would be likely to follow. Mr Eliades evidence on this issue lacked credibility and I do not accept it.

63.    Whatever the position as to the true ownership of 39 Beech Hill may be (I have made no findings upon it but rely upon the judgment of Mr Justice Peter Smith) I am satisfied that Mr Eliades gave inaccurate evidence about Mr Kaissides and his relationship with him in order to frustrate any investigation into his own financial affairs. Such behaviour is clear evidence of a risk of dissipation of assets.

### (c) Championship Boxing Limited

64.    I found Mr Eliades' explanation as to the meaning of 'cleaner housekeeping' difficult to follow. It is said that boxing contracts were put into CBL which dealt with promotions and management and the fact that the shares were deemed to be held in trust for Panix was disclosed. It was a way of differentiating different companies from different regions and putting different contracts in them. Mr Eliades said that that made life easier. The reason that the shares of the company were put into the names of individuals who had nothing to do with the company itself was because of a small company's tax rule. It enabled tax relief to be obtained for Panix. (Day 4 565). After hearing these explanations I still remained unclear as to the reason why the boxing contracts should be put into a company in the name of two shareholders who are not employed by that company in trust for either Mr Eliades or Panix Promotions Limited but without any written document to that effect. It suggested that Mr Eliades was keeping himself one step removed from ownership of the company.

65.    Mr Eliades' evidence about the share transfer to Mr Lewis, 39 Beech Hill, Mr Kaissides and CBL all demonstrate in my judgment a clear risk of the dissipation of assets. I now turn to other instances of Mr Eliades' conduct which are relevant not merely to this issue, but also to whether special circumstances exist such as to render it inequitable for the undertaking to be enforced.

### Mr Eliades' conduct.

#### (i) Failure to disclose the Memorandum of Understanding 19 December 2001 in evidence before Mr Justice McCombe.

66.    This memorandum of understanding was signed by Vassily Jirov the boxer, his manager Ivaylo Gotzev, Sugar Ray Leonard Boxing and Championship Boxing Limited. It expressly stated that the parties signing the document acknowledged and agreed that it was their intent that the events specified should take place as outlined in that memorandum of understanding. The events were the February 1 2002 event in Phoenix, Arizona in which Vassiliy Jirov was to defend his world title, and two further bouts. The memorandum of understanding set out a co-promotional rights agreement between SRL Boxing, Vassily Jirov, Ivaylo Gotzev and Championship Boxing Limited. The first of the fights which this co-promotional agreement referred to was the world title defence by Mr Jirov on February 1 2002 (clause III). Sugar Ray Leonard Boxing was to be the lead promoter and in relation to the February 1 2002 event and was to receive 100% of all revenues, other than the gate revenues, generated by the February 1 2002 event televised by ESPN. SRLB was also to receive 100% of all revenues generated by any other ESPN event that Mr Jirov participated in during the term that was promoted by them. The memorandum set out the responsibilities of Championship Boxing Limited and Sugar Ray Leonard Boxing respectively in relation to the February 1 2002 fight. It was CBL's responsibility to pay the purses and expenses of the main event (I(a)(i-v)) and SRLB's responsibility to

pay the purses of the under card, medical insurance, and the flights. (I(b)(viii, x & xii). It was SRLB's specific responsibility to ensure that event was broadcast by ESPN. (I(b)(iv))

67.     I was informed by Mr Gotzev in evidence that Mr Eliades was not happy about the co-promotional agreement because of the money that SRLB was going to take from the February 1 2002 fight. Mr Gotzev said however that he was the one that told Mr Eliades that they needed Sugar Ray Leonard Boxing for the exposure they were getting. He thought it was a good move for his fighter to have Sugar Ray Leonard promoting the fight but Mr Eliades did not like it. It was Sugar Ray Leonard who actually obtained the licence because Mr Eliades could not travel (Day 2 193)

68.     In a letter written on 3 April 2002 by Mr Eliades to Mr Jirov's lawyer in response to their claim for their client's purse for the 1 February 2002 fight, Mr Eliades said that he was "not in agreement with the co-promotional agreement being entered into with SRL Boxing" and that he did not want to be a party to an agreement where "there was nothing to gain". In the same letter Mr Eliades said:-

> "Mr Gotzev was advised in front of a witness that I would finance the show in Arizona but would not pay for any losses, as it was apparent that the profits could only be generated from the gate receipts. I expressed my concerns on how much the gate receipts would generate and also having to pay the extra expenses of the under card boxers where I was not receiving anything from ESPN."

69.     This letter, which I understand is said to be part of Mr Eliades' negotiating stance against Mr Jirov's claim against him, confirms on its face his reluctance to be a party to the co-promotional agreement where there was "nothing to gain" and where he was not receiving anything from ESPN.

70.     In a letter of 25 January 2002 written by Messrs Harkavys, Mr Eliades' solicitors, it was said that the Jirov fight on 1 February 2001 "would largely pay for itself in the end but is not expected to generate any substantial profit because, whilst Mr Jirov is defending his title, the challenger Mr Castro is not seen as a serious challenge." No mention of the memorandum of understanding was made in that letter.

71.     Nor did Mr Eliades mention the memorandum of understanding in either of his affidavits before Mr Justice McCombe (paragraph 50 of his first affidavit and paragraphs 23-27 of his second affidavit (6A/12/71, 123-4)).

72.     In evidence Mr Eliades told me that the memorandum of understanding was not disclosed because it had nothing to do with the 1st February fight, and had been varied in part orally. Mr Eliades told me that whatever the document said, he was the lead promoter and was responsible for the payment of nearly everything except for the under card and the travel of the under card. There was no need for him to have included it in the affidavit as Sugar Ray Leonard wasn't going to pay any money towards the main event and was not really interested. Mr Eliades' evidence upon this issue was wholly unsatisfactory. The memorandum of understanding expressly applied to the 1 February 2002 Jirov world title defence. It was clearly a relevant document and Mr Eliades' contention that it was not is untenable. Without this

document Mr Justice McCombe was unaware of the fact that CBL was only entitled to the gate revenues from the 1 February 2002 fight, the co-promoter Sugar Ray Leonard Boxing being entitled to other revenue from the promotion. A misleading impression was therefore given as to the true role which the Panix companies were playing in the promotion, and any profit they might make from it.

73.    In paragraph 26 of his second affidavit before Mr Justice McCombe Mr Eliades said, when setting out the expenditure which he needed to find for the bout to take place:-

> "A further US $40,000 needs to be paid for the so called 'under card', the lesser fights which were held on the same occasion before the main bout on completion."

74.    As Mr Eliades accepted in evidence before me, the memorandum of understanding did not require him or the Panix companies to pay the costs of the under card, those were the responsibility of Sugar Ray Leonard Boxing. Mr Eliades told me that the reference to US $40,000 being needed for the under card in his affidavit was incorrect and should have read "40,000 for expenses." He explained that there were US $40,000 worth of expenses which were his responsibility that were not called the under card. (Day 4 538 – 539) I can see no valid reason for Mr Eliades' failure to disclose the memorandum of understanding and the combination of that failure together with the alleged error relating to the costs of the under card which the memorandum of understanding would have disclosed were not his responsibility, is to say the least, unfortunate.

75.    The alleged error is however compounded by the contents of paragraph 27 of Mr Eliades' second affidavit in which he states... "ESPN TV will pay US $70,000 the Monday after the fight. A further US $100,000 might be received from international broadcasters". All payments from ESPN were however due to Sugar Ray Leonard Boxing under the memorandum of understanding, none of them to the Panix companies. Mr Eliades told me in evidence that this section of his affidavit should have said that the whole sum of US $170,000 might be received from international broadcasters not US $100,000 and US $70,000 from ESPN, as the US $70,000 from ESPN was "not due to Panix, it was due to Sugar Ray Leonard". The reason why this error was made Mr Eliades said, was because of time pressure on his lawyers. He said that he had made that clear to them but with the pressure and the amount of things going on he was close to exhaustion and his barrister was working all hours of the day and night. Without the memorandum of understanding Mr Justice McCombe could not have known that Mr Eliades was not entitled to any money from ESPN.

76.    It is to be noted that there is no documentation whatsoever produced in relation to any television agreement with international broadcasters, and that the basis upon which Mr Eliades claimed entitlement to it was an undocumented oral written variation of the memorandum of understanding.

77.    I do not accept Mr Eliades' evidence upon this issue. It was wholly unconvincing and too much of a coincidence that both the errors which he says were made asserted a level of financial benefit for the Panix companies which the disclosure of the clearly relevant memorandum of understanding would have revealed were unsustainable. I

conclude that Mr Eliades failed to disclose the memorandum of understanding and asserted that he was obliged to pay the US \$40,000 costs of the under card and was a potential recipient of US \$70,000 from ESPN in order to mislead Mr Justice McCombe as to the level of loss he might have suffered as a part of the freezing order.

### (ii) Failure to disclose the legal charge over 24 Parliament Hill.

78.     It was agreed between the parties' expert accountants that as at the date when the freezing order was granted on the 15 January 2002 the sum of £378,397 was still available for draw down by the Panix companies and Mr Eliades from the facility which had been made available to them by Managa Properties Limited. A facility of £2,000,000 had been granted on 24 October 2001 of which £1,621,603 had been drawn down. In a letter of 24 January 2002 from Savser Management Limited, company secretary of Managa Properties Limited, it was said that the advance had been made on the understanding that the funds would be secured by way of a charge on two properties, 24 Parliament Hill, London NW3 and 84 Green Lanes, London N16 and that the only reason the money was advanced to Mr Eliades prior to registration of the charges was because of the family connection with his brother Mr Christos Eliades who was the beneficial owner of the company. The letter stated that the company had additional funds to advance to Panix Promotions Limited but as they understood that an injunction had been placed over the two properties no further funds could be advanced until the charges on the previous properties pledged had been completed.

79.     Mr Eliades told me in evidence that his brother would not put himself in a position whereby he broke a court order and hence until the freezing order was lifted there was no possibility of obtaining the further monies potentially available from the facility as the properties could not be charged.

80.     In fact a further £150,000 was advanced by Managa for the purposes of funding the accountancy fees in the New York action, on the basis that only one of the properties, namely Green Lanes, was charged. The New York Court made the appropriate order after Mr Eliades' New York lawyers had requested that the property be charged on 25 January 2002. Thus it appeared that Managa would be prepared, contrary to the letter from Savser of 24 January 2002, to advance further funds without both properties being charged. This perhaps was not surprising because Mr Panos Eliades and Mr Christos Eliades were brothers and Mr Eliades had said in evidence that his brother would not leave him in the lurch.

81.     Whether or not funds were available to Mr Eliades was a relevant issue in the proceedings before Mr Justice McCombe and before me as the Court was informed that the freezing order had created very substantial cash flow difficulties. Any document which had the potential to relieve such cash flow difficulties was plainly relevant for disclosure. On 25 January 2002 Mr Eliades had in fact executed a legal charge between himself and Managa in relation to 24 Parliament Hill. The document was relevant as to whether further funds could therefore be advanced by Managa. Mr Eliades did not tell his lawyers about the signed charge (Day 3 439, Day 5 548) and did not disclose the document. The document was however relevant on its face as it was a step towards satisfying the conditions of the Managa facility.

20/12 2005 09:52 FAX 020782273f          BLACKSTONE                              @021/034

82.    Mr Eliades told me in evidence that he did not see that the charge was relevant until it
       was registered and that did not occur until 21 February 2002. He pointed to the fact
       that Barclays Bank to whom he was overdrawn to the extent of about £41,000 had
       said in their letter of 18 January 2002 that the security held in his name was also
       caught under the order and he would be unable to deal with it. Until the charge was
       registered and the Barclays overdraft had been paid off the charge was he thought of
       no relevance.

83.    Whilst this was not as significant a document as the memorandum of understanding, I
       am satisfied that Mr Eliades knew that he should have brought it to the attention of his
       lawyers and to the Court as it was relevant to the cash flow problems which the
       freezing order had created. It is in my judgment an example of Mr Eliades' reluctance
       to give the full picture to the Court when he perceives it might be to his disadvantage
       to do so.

       ### (iii) Admitted lies concerning Managa, Bambaklutsh Properties Limited and Claudius Properties Limited.

84.    In his New York deposition in January 2002 Mr Eliades said that he had sold a
       property at 6 Bloomsbury Square to Managa Properties Limited and that he did not
       know who owned that company. He also said that he was not sure who owned
       Bambaklutsh Properties Limited and Claudius Properties Limited. In fact he knew
       that his brother was the beneficial owner of Managa and that it was either his brother
       Christos, his wife or his wife's family who owned Bambaklutsh and Claudius. He
       accepted in evidence before me that he had lied in the New York proceedings about
       who owned those companies and said that he had done so in order to protect people
       from being harassed. (Day 4 578 579)

85.    This is another demonstration of the fact that Mr Eliades is prepared to lie on oath if
       he considers it necessary or helpful to do so.

### Delay

86.    Mr Ian Mill QC on behalf of Mr Lewis relied in addition, or alternatively, upon the
       delay before Mr Eliades applied for the enquiry for damages. He submits that the
       authorities establish that delay in itself, even where no prejudice is caused, may result
       in a court declining to enforce the undertaking. (Gee paragraph 11.024).

87.    Here there has been a delay of some 2 years 9 months from Mr Justice McCombe's
       order to the application for a formal enquiry. It was only when the final US appeal
       was dismissed in October 2004 that the application was made. This demonstrates that
       Mr Eliades was waiting until all other possible avenues for avoiding the New York
       judgment had evaporated. The consequence of the delay Mr Mill submits, is that Mr
       Lewis has not been able to enforce his judgment against Mr Eliades and the Panix
       companies. This is a significant factor in the exercise of discretion.

88.    Mr Warwick submits that there is no evidence of actual prejudice, that prejudice is
       always relevant and it is clear that none has occurred here. In any event the
       chronology he submitted, and which was considered in evidence shows that Mr
       Eliades was right in his evidence when he says that in effect there was "no respite

from constant litigation on both sides of the Atlantic". (Paragraph 10 1ˢᵗ witness statement 8 November 2004), and that was the cause of the delay.

89. There is no doubt that there has been regular litigation between the parties which will have been time consuming. But I am satisfied on the evidence that there is no substantial reason for not issuing the application for an enquiry from the end of 2002. Mr Eliades' personal involvement in the litigation has not been substantial during the period 2003/2004 save in relation to 39 Beech Hill. I have taken this delay into account in considering the question of discretion. I have not considered it a sufficient reason in itself to justify refusing to enforce the undertaking.

## Mr Burstein's conduct.

90. Consideration of any failures to give full and frank disclosure in making the application for a freezing order, the accuracy of the evidence relied upon, the scope of the order, the appropriateness of seeking the freezing order just before the New York trial, and Mr Burstein's motives in seeking the freezing order is necessary for the purposes of exercising my discretion.

91. I have considered each of Mr Warwick's criticisms of the defects in Mr Burstein's evidence and the draft order together with those set out in Mr Lowe's skeleton for the purposes of the hearing before Mr Justice McCombe of 30 January 2002.

## Defects in disclosure and the evidence.

92. (1) Mr Burstein did not disclose that his retainer involved, in part, a contingent fee. I indicated in argument, and remain of the view, that this should have been disclosed. Mr Burstein's own view of Mr Eliades as well as an objective assessment of his evidence and inferences to be drawn from it, was relevant and hence, the fact that Mr Burstein might benefit from the outcome of the action was also relevant.

93. I am satisfied having heard Mr Burstein give evidence that although not to him at that time, such retainers were very common in the United States and that it did not occur to him to disclose its existence because he did not regard his own credibility as an issue. This was therefore a failure to disclose, albeit I conclude, having heard the evidence, an innocent one.

94. (2) Mr Burstein accepted in retrospect that he should have presented the Court with not merely the answers given in cross-examination by Mr Eliades to Mr English on the transfer of shares issue but also the answers given to him. This is clearly correct; the Court should have been given both parts of the deposition so that it had the full references before it. I accept however Mr Burstein's rather forceful evidence on this issue in which he stated that he regarded all of Mr Eliades' evidence upon this issue as being without credibility or merit. I am satisfied that this was also an innocent failure on Mr Burstein's behalf. He regarded Mr Eliades' evidence on this issue dismissively and was not as thorough in his citation of the cross-examination as he should have been.

95. (3) This concerns Mr Burstein's statement that Mr Eliades was claiming to be essentially bankrupt in his deposition whereas this was Mr Burstein's interpretation of what Mr Eliades was saying rather than a quotation of Mr Eliades words.

96.    This is essentially a matter of phraseology. Certainly it appears from Mr Lewis' solicitor's note of the hearing before Mr Justice Pitchford that he regarded Mr Eliades' account as amounting to an assertion in evidence of insolvency.

97.    I do not consider that Mr Burstein's choice of language was in any way misleading.

98.    (4) The enquiry agents instructed on Mr Lewis' behalf to investigate assets were asked to investigate Mr Christos Eliades' assets in England and Wales only, yet Mr Burstein in his affidavit stated that the investigators had not been able to identify <u>any</u> assets. He referred to the affidavit of the enquiry agents, Decisions Strategies UK Limited, which made it clear what the limit of their instructions was, but it was an error in Mr Burstein's affidavit to refer to any assets rather than any assets in England and Wales. I am satisfied having heard Mr Burstein that this was an unintentional error.

99.    (5) The complaint that Mr Burstein again stated that Mr Eliades 'claimed' to have lost some US $6M is a matter of phraseology and does not amount to a failure in Mr Burstein's evidence.

100.   (6) The draft order was Mr Warwick contends, seriously defective because it included many properties which simply should not have been there. Mr Justice McCombe should have been informed which properties were in the names of Panix parties and which were not and the alleged specific grounds for including such properties. The failure to identify the assets and the reason for their inclusion amounted to a failure in the evidence. Mr Justice McCombe placed particular emphasis on this, describing the evidence supporting the inclusion of the properties as being "flimsy or non-existent".

101.   Mr Burstein relied upon independent agents to list properties connected with Mr Eliades or the Panix companies. It turned out that seven properties were wrongly included; one of those had been owned by Managa and indeed owned by Mr Eliades before that, another had been owned by Mr Eliades' partner and the question arose as to whether he had attributed anything towards the purchase price, another was the registered address of Managa, another had been owned by a director of CBL and another was the registered office of Treptos, another of Mr Eliades' companies. Of the remaining properties in one case the wrong Eliades had been chosen and in another the wrong address was used. These were errors by the enquiry agent and should not have been included. The task facing an enquiry agent in such circumstances however was not straight forward given the numerous companies with which Mr Eliades either was or might be connected with. On the evidence now available before me I am not as critical of Mr Burstein as Mr Justice McCombe was on the evidence then available to him. It is not without significance that one of the properties Mr Eliades denied ownership of, has been found by Mr Justice Peter Smith to be Mr Eliades' property. For my part I do not consider the number of errors made by the enquiry agent in this case as amounting to a serious defect in the evidence for Mr Lewis given the problem in ascertaining what Mr Eliades did or did not own, or have an interest in.

102.   (7) Mr Warwick makes strong criticism of the fact that the draft order expressly froze any monies held in the accounts of Mr Eliades or the Panix companies New York lawyers or accountants. He dismisses Mr Burstein's explanation in evidence as most unsatisfactory. I do not find it so. Mr Burstein explained that it was not uncommon for a lawyer, in order to secure his fees, to have a large amount held on retainer. Mr

Eliades' lawyer, Mr Jay Goldberg did that, and Mr Eliades had in the past deposited 'significant sums of money with another of his lawyers...which he used in essence as his personal bank account.' (Day 5 690) Mr Burstein told me that he was not suggesting that Mr Goldberg was operating as a sort of bank but in view of Mr Eliades' past similar use of a lawyer he considered it right to be as over inclusive as possible whilst protecting Mr Eliades' right to have his legal counsel's fees paid.

103.  As to the accountant Mr Burstein simply considered that they might be taking a large retainer.

104.  Contrary to Mr Warwick's submission I accept Mr Burstein's explanation. Both the practise in the United States of America of taking large retainers and Mr Eliades' use of a former solicitor as if he were a bank support the course of action which Mr Burstein took. I do not think he can be properly criticised for seeking an order which was so drafted.

105.  Furthermore whilst there was no express proviso saving expenditure by the accountants I do not consider that in the circumstances the order was incorrectly or too widely drafted.

## Mr Burstein's motive in making the application and the appropriateness of the order.

106.  Mr Warwick, at the invitation of the Court, put the allegation to Mr Burstein directly, that he had chosen the moment to apply for a freezing order when he did in order to disrupt the New York trial. Alternatively Mr Warwick contended that if this was not Mr Burstein's intention he was certainly reckless as to whether this might be the consequence. In view of the allegations and Mr Justice McCombe's immediate concern on reading the papers that the application might be a tactical one calculated to disrupt the Defendant's preparation for the New York trial I have considered Mr Burstein's evidence upon the issue with care. I formed the clear impression from the written and oral evidence that Mr Burstein is a forceful articulate and uncompromising lawyer and opponent. I also formed the clear impression that he was not at any stage seeking to mislead the Court.

107.  I accept his evidence that the seeds of apprehension about Mr Eliades not being prepared to satisfy any judgment which Mr Lewis might obtain on the counterclaim were sown in November 2001 when he gave evidence about the transfer of shares to Mr Lewis. This evidence caused him concerns which were added to when on 9 December 2001 Mr Jay Goldberg, Mr Eliades' lead attorney, said in a telephone call that the New York action might turn out like the Kerzener case "where you get a big judgment and cannot collect anything." In evidence Mr Burstein told me that Kerzener was in effect a shorthand for hiding assets. This caused him greater concern and he prepared further questions about Mr Eliades' assets for the January deposition. The answers he then received were interpreted by him against the background of what he had heard in November 2001. The evidence that was given, particularly about the substantial reduction in assets between September 2001 and January 2002 and the transfer of properties to his brother as security for money allegedly lent to him by his brother and lack of clarity about ownership of properties (paragraphs 20(3)-6) of Mr Burstein's affidavit dated 18 January 2002) converted his nagging concerns about concealment into greater concerns and made him believe that Mr Eliades was in fact moving assets in an attempt to avoid the consequences of any judgments against him.

20/12 2005 09:53 FAX 020782273.          BLACKSTONE                    ☒025/034

108.  On the evening of the first day of the deposition, Thursday 10 January 2002, Mr Burstein contacted Mr Lewis' English solicitors, Forbes Anderson, and consulted with them as to the availability of a freezing order. He was told that on the facts that he had described Mr Forbes thought that there was a basis for seeking such an order.

109.  The next day, on 11 January 2002, the second day of the January 2002 deposition in New York Mr Steven Isser another of Mr Eliades' lawyers, told Mr Burstein that the US $40 cheque served upon Mr Eliades with a trial subpoena might be one of the 50% which were never cashed and if so, that was the only money he would ever see out of the case. (Day 5 734)

110.  I am satisfied, having heard his evidence, that Mr Burstein held a very low opinion of Mr Eliades. He did indeed think that he was a thoroughly dishonest individual and that he had cheated Mr Lewis out of substantial sums over and above the true earnings to which he and the Panix companies were entitled. I am satisfied that Mr Burstein had a strong belief in the likelihood of Mr Lewis' victory on the counterclaim. I also accept Mr Burstein's evidence that it was not until the January deposition that his concerns formed from November 2001 onwards were converted into such serious concerns that he immediately after the end of the deposition on 10 January 2002 rang Mr Forbes to ask about the availability of a freezing order.

111.  Mr Burstein told me, and I accept, that he did not want any adjournment of the New York hearing. An application was in fact made by Mr Goldberg for such an adjournment on the grounds of the effect of the freezing order but the motion was denied. Mr Burstein had worked with Mr Goldberg on many occasions as well as against him and knew how he prepared his cases. He was quite satisfied that cross-examination of the witnesses would have been prepared long before the weeks leading up to the hearing and that obtaining a freezing order would not hamper the lawyer's preparation of the trial. Mr Burstein made it equally clear in evidence that he was not concerned about any disruption to Mr Eliades' way of life.

112.  Not only was there no risk that the lawyers had not fully prepared for the case but there was also no prospect under the American system that they would not be paid, Mr Burstein told me. Again, having heard the evidence of Mr Burstein upon this issue I accept it. I am satisfied that he did not intend disruption of the preparation of the case for Mr Eliades and the Panix companies of the New York trial. Nor was Mr Burstein reckless as to the risk of disruption. He was at all times entirely aware of what he was doing. He became satisfied in January 2002 that the risk of dissipation of assets was so real that he should take steps to protect the situation and did that. He intended to prevent the dissipation of assets and obtained an order to that effect and did so at that time because it was then that he came to the view that formal steps needed to be taken. He did not think that the lawyers preparation for the case of Mr Eliades and his companies would be disrupted but didn't have any concern if Mr Eliades way of life was disrupted.

113.  On the basis of Mr Burstein's evidence and the refusal of the New York court to order an adjournment I am satisfied that the preparation of the case on behalf of Mr Eliades and the Panix companies was not significantly disrupted. Furthermore, I do not accept Mr Warwick's submission that an application for a freezing order would or should rarely be granted so close to a trial. Much will depend upon the individual circumstances. If only at such a late stage real evidence emerges of an intention to

dissipate assets by a Defendant in a strongly arguable case for a Claimant, it will be appropriate to make such an application even if close to trial. Mr Justice Pitchford was aware of the trial date of 1 February 2002 here and nevertheless made the order. The fact that Mr Burstein did not expressly state that he did not think there would be disruption of trial does not in my judgment indicate that he had any intention to disrupt. He was satisfied that the grant of a freezing order would not obstruct or hamper the management of the case in New York.

114.    I do not therefore consider that an application for a freezing order at such a late stage is inappropriate and should not be granted. If that was so a dishonest Defendant could with immunity dissipate his assets immediately prior to a trial.

## Conclusions on the issue of discretion.

115.    (1) The findings of the New York jury against Mr Eliades and the Panix companies on the counterclaim, including findings of fraud, establish that Mr Lewis had a good arguable case.

116.    (2) The evidence of Mr Eliades of the share transfer to Mr Lewis, his denial of the ownership of 39 Beech Hill, his admitted lies about Mr Kaissides in relation to that property, and his unclear evidence about the purpose of the structure and purpose of CBL establish a preparedness to hide assets, the actual hiding of assets in relation to 39 Beech Hill, alternatively a clear risk of the dissipation of assets. The failure to disclose the memorandum of understanding or the failure to disclose the legal charge of 24 Parliament Hill together with the other admitted lies relating to Managa, Bambaklutsh and Claudius support the risk of dissipation of assets, as does the fact that no attempt has been made to pay any part of the judgment in favour of Mr Lewis since it was ordered.

117.    (3) Mr Eliades misled Mr Justice McCombe by failing to disclose the memorandum of understanding dated 19 December 2001. He asserted that he was responsible for the US $40,000 under card expenses when he knew he was not and dishonestly stated in his evidence before me that the reference in his affidavit was incorrect and should have referred to US $40,000 for expenses. He also implied in his evidence before Mr Justice McCombe that he was entitled to US $70,000 from ESPN TV when he knew he was not and dishonestly told me in evidence that that US $70,000 should have been part of the money due from international broadcasters not ESPN. No documents have ever been produced to show that there was any contract with any international broadcaster or indeed any discussion with such a broadcaster. Mr Eliades knew that the memorandum of understanding did apply but deliberately withheld it so as to give the impression that he or his companies were likely to make more money out of the fight than was the case. Such inaccurate evidence was relevant both to the application to discharge the injunction, to the ordering of an enquiry and to the enforcement of the undertaking.

118.    (4) The failure to disclose the legal charge over Parliament Hill was deliberate and designed to keep from the Court a document which might demonstrate that his cash flow problems as a result of the freezing order were not as great as he asserted. As the evidence about the transfer of shares to Mr Lewis demonstrated Mr Eliades was prepared to lie on oath if he perceived it in his interests to do so. He lied to Mr Justice McCombe in relation to Mr Kaissides and his relationship to him. This was done in

20/12 2000 08:09 FAX  020/02213           BLACKSTONE

order to prevent the true picture being put before the Court. Mr Justice Peter Smith had found that Mr Eliades was the beneficial owner of 39 Beech Hill and accordingly his evidence before Mr Justice McCombe that he was not, was knowingly dishonest. The evidence which he gave to Mr Justice McCombe on these issues was false and designed to assist in painting a picture favourable to his application to discharge the injunction and deny dissipation of assets.

119.    (5) There has been significant inadequately explained delay in making the application for the inquiry as to damages. The 2 year 9 month delay has prevented Mr Lewis from enforcing his judgment.

120.    (6) Mr Burstein did not seek at any time to mislead Mr Justice McCombe or this Court. Nevertheless there were failures in full disclosure, albeit innocent, which could well have resulted in the freezing order being discharged had they been known to the Court. These failures to disclose are the failure to disclose his contingent fee retainer, and the failure to give full references to the transcript in relation to the share transfer issue. I do not regard the error in listing Mr Christos Eliades' assets or the incorrect listing of some of the properties in all the circumstances as amounting to a failure to give proper disclosure or in any way an abuse of the procedure. This Court is now fully aware of the difficulties of tracing properties with which Mr Eliades or his companies had a connection and that he was lying about his ownership of one of them, 39 Beech Hill, and thereby seeking to conceal his assets.

121.    (7) Mr Burstein did not apply to freeze the assets of Mr Eliades and the Panix companies in order to disrupt the New York proceedings. On the contrary he believed that Mr Eliades' case and that of the Panix companies was prepared before the application was made. He made the application because his concerns about the risk of the concealing of assets by Mr Eliades became so great after his deposition of 10 January 2002 that he considered action needed to be taken. He had a very strong belief in the strength of Mr Lewis' case including the belief that Mr Eliades had defrauded Mr Lewis and became convinced after 10 January 2002 that steps needed to be taken to freeze Mr Eliades' assets otherwise there would be nothing to satisfy Mr Lewis' likely judgment on the counterclaims. Mr Burstein's attitude towards Mr Eliades, because of his strong belief in his dishonesty, was uncompromising. This is well exemplified by the interviews which Mr Burstein gave to the press publicising the obtaining of the freezing order. Such publicity was inappropriate in England whatever the situation may be in the United States of America.

122.    (8) I do not consider that the application for the freezing order was made so close to the New York trial that it should not have been granted. Provided that a strong arguable case and a serious risk of dissipation of assets is established it is an appropriate step to take to prevent assets being concealed or dissipated so that the likely judgment cannot be satisfied.

123.    (9) A Court that was aware of the strength of Mr Lewis' claim, including the allegations of fraud, that Mr Eliades had concealed assets or dissipated them, and that he had lied in the New York depositions, before Mr Justice McCombe, before Mr Justice Peter Smith and before this Court, would probably conclude, as I would, that in spite of the failures in disclosure by Mr Burstein and his conduct, a freezing order should be granted. I must accept however that some judges might weigh the matter differently and come to a different conclusion or decide that the failure to disclose, or

20/12 2005 09:54 FAX  020782273"    BLACKSTONE                                  ⌀028/034

the proximity of the trial merited the refusal to grant such an order or such facts together with the publicity given to the freezing order after it had been made, would justify the discharge of such an order.

124.    (10) My conclusion is that the injunction was not wrongly granted but was justified on the merits, and accordingly the claim for damages must fail as Mr Eliades and his companies were not improperly prevented from doing something they were entitled to do. In any event however even if my conclusion upon this matter is wrong and the injunction should not have been granted or should have been discharged even with the knowledge that is now before the Court, I would nevertheless decline to enforce the undertaking as to damages because special circumstances exist here which justify such a course of action. In my judgment it would be inequitable to enforce the undertaking given the fraud which the New York jury found, the deliberate concealing of assets, the misleading of Mr Justice McCombe and the lies at the New York deposition, before Mr Justice McCombe, before Mr Justice Peter Smith and before me. Such conduct save in relation to the initial fraud, relates directly to the continuing of the injunction or the enforcement of the undertaking in that it was designed to assist in the discharge of the injunction and to put forward a false level of loss to arise out of it. In such circumstances, having considered Mr Eliades' and Mr Burstein's conduct, it would in my judgment be inequitable for the undertaking to be enforced. It is not that the merits can legitimise an improperly obtained injunction, but that even if an injunction has been improperly obtained the Court must consider in its discretion whether or not it would be inequitable for the undertaking to be enforced.

125.    I therefore dismiss the claim for damages by Mr Eliades, Panix Promotions Limited and Panix of the US Inc.

126.    The question of damages does not arise upon my finding but I indicated to the parties that whatever I concluded on the issue of discretion I would also deal with the issue of damages.

## Damages.

127.    The ordinary rules as to causation, remoteness and mitigation apply to a claim for damages for breach of a cross undertaking.

128.    I heard evidence on the issue of damages from Mr Eliades, Mr Duva, a boxing promoter, Ms Allyson Stafford, Mr Eliades' assistant, Mr Ivaylo Gotzev, Mr Jirov's manager and Mr Travis Simms. I declined to admit a Civil Evidence Act notice in relation to Mr Jirov. There was also a written statement from Mr Emanuel Steward, an eminent boxing trainer. It was clear from this evidence and indeed from the success of Mr Lewis' career that, whilst his relationship with Mr Lewis was ongoing, Mr Eliades was a very successful promoter and manager. Mr Travis Simms who came to London to give evidence indicated that Mr Eliades had expertise and leverage in the boxing industry which smaller promoters did not have.

129.    I have also had oral and written evidence from two expert accountants, Mr Andronikou on behalf of Mr Eliades and Mr Ilett on behalf of Mr Lewis. The issues on damages were however a matter essentially for judgment rather than expert evidence and I found their evidence of limited value.

130.  I accept Mr Eliades evidence that the freezing order was a very difficult burden to bear and caused him considerable anxiety, substantial financial restrictions for the period of the order and additional work in having to declare his assets and return to England to seek the discharge of the order.

131.  There are three important matters to be borne in mind when considering the claim for damages. Firstly Mr Eliades does not claim that he had lost this boxing business generally because of the freezing order; his claim is limited to the three specific boxers Jirov, Toney and Simms. Secondly the sources of finance available to him immediately before the freezing order namely the remaining part of the Managa facility, the £100,000 a year he received from rental income from his properties and his earnings from his insolvency practice were available to him when the order was discharged subject of course to the later freezing order imposed in New York and its restrictions. Thirdly the possibility of an application for paying the Jirov expenses was raised in Mr Eliades' solicitor's letter of 25 January 2002 but no application was ever made to the Court for such business expenses to be paid. The lack of US $9,000 in relation to Mr Simms was not mentioned at all.

132.  I have considered each of the three claims and have come to the clear conclusion that there is an over riding reason why each of them must fail at the outset. This is because Mr Eliades and the Panix companies are not able to establish causation. Any loss which may have occurred was not caused by the freezing order but by the New York proceedings and the New York judgment.

133.  After the New York judgment the BBC did not want to do any further business with Mr Eliades other than dates which had already been agreed for March 2002 and possibly May 2002. (Day 3 330). The British Boxing Board of Control suspended Mr Eliades' licence in May 2002 and he never applied for one again. His Nevada boxing licence expired in January 2002 and was not renewed by him. The public breakdown in the relationship between Mr Eliades and Mr Lewis may well have reduced confidence in the minds of some in Mr Eliades, but when the findings of fraud, breach of fiduciary duty and racketeering were made by the New York jury, it is probable that trust in Mr Eliades sank to a very low level. It would be surprising if the response of the BBC was atypical.

134.  Mr Gotzev acknowledged that Mr Eliades had 'all these problems', without defining them, and said that he wasn't able to continue on being a promoter. (Day 2 262). Mr Gotzev told me that it was he who felt the need for Sugar Ray Leonard Boxing to be brought in as co-promoter on behalf of his boxer, Jirov. He effected this in spite of Mr Eliades' reluctance, which was based on his fear that he might make even less money than he might have made out of the promotion. Mr Eliades, albeit in response to a claim made on behalf of Mr Jirov by his lawyers, said in a letter of 3 April 2002 that he was not in agreement with the co-promotional agreement being entered into with SRL Boxing and that he did not want to be party to an agreement 'where there was nothing to gain'. It is also clear from this letter that Mr Eliades was concerned as to how much the gate receipts would generate when, amongst other things, he was not receiving anything from ESPN TV as that was all going to SRL Boxing.

135.  Messrs Harkavys' letter of 25 January 2002 indicated however that the 1 February 2002 fight was not expected to generate any substantial profit because 'whilst Mr Jirov is defending his title, the challenger Mr Castro is not seen as a serious

20/12 2005 09:55 FAX  02078227    9        BLACKSTONE                              ☒030/034

challenger.' Clearly Mr Eliades had no great enthusiasm for this particular promotion and the profit it might bring him.

136.   It is reasonable to infer that the need for Mr Eliades to have a co-promoter arose out of the need for his attendance at the New York trial and the reduction in confidence which those proceedings, alleging breach of fiduciary duty, fraud and racketeering on his part, had brought about. Plainly Mr Gotzev felt that there was a need for Sugar Ray Leonard to obtain the ESPN TV rights, front the proceedings and appear at press conferences. He did appear at two press conferences (though Mr Gotzev also considered that it would have been better had Mr Eliades been present to promote the fight as well. I am not satisfied on the evidence however that it was ever Mr Eliades' intention to leave New York and attend the fight in Arizona. He was not enthusiastic about the fight, and reluctant about SRL's involvement who he knew was handling the press conferences. Furthermore in his evidence before Mr Justice McCombe Mr Eliades did not say he was planning to go to Arizona, but said that he planned to be in New York preparing for the trial.

137.   I am not satisfied that Mr Eliades has shown that had it not been for the January 2002 freezing order he would have successfully promoted or managed the fights he claims he would have done. The probability is that it was the New York proceedings and the disastrous findings of the New York jury rather than the seventeen days of the freezing order in London which effectively brought to an end his ability to act as a promoter or manager.

138.   Further causation issues arise in the Jirov and Toney claims. Mr Eliades had at least the remaining Managa facility and the rental income and insolvency practice earnings available to him after the freezing order had been discharged. I am satisfied that once he had signed the legal charge to 24 Parliament Hill Managa would have released further funds to him. If they needed to register the charge they could have applied to the Court for permission to do so. Those funds were sufficient for him to have paid Mr Jirov whose solicitors were taking a very conciliatory view as to the time frame in which their client had to be paid (even if the purse was by custom paid before the fight) as can be seen from Fried and Company's letter of April 5 2002. Mr Eliades chose not to pay any sum to Mr Jirov. Had he done so he would have created the opportunity for their relationship to continue. His failure to pay Mr Jirov's purse was the only reason a Jones/Jirov fight, which Mr Eliades had been trying to promote, did not take place. It was not common sense, he accepted, to lose the opportunity of US $500,000 by failing to make that payment.

139.   Another difficulty faced by Mr Eliades if continuing in the boxing business was that any earnings he made from boxing bouts would be attached as earnings by Mr Lewis. Mr Eliades told me in evidence that the New York proceedings, and the difficulties with Mr Jirov and Mr Travis Simms had caused him to close down his boxing business in March 2002. Insofar as that evidence suggests that the freezing order was responsible for his closing down his boxing business, I reject it. The difficulties with the Jirov bout on 1 February 2002 plainly pre-existed the freezing order as the appointment of Sugar Ray Leonard as co-promoter demonstrated. Mr Eliades' lack of enthusiasm for the fight and his belief that it would not make money are the reasons, together with the New York proceedings, which brought about his failure to pay Mr Jirov and the end of his relationship with him. Mr Eliades promised Mr Simms through Allyson Stafford to pay the US $9,000, could have done, but chose not to do

20/12 2003 05:05 FAX 020102211   BLACKSTONE   ☑031/034

so. I am satisfied on the evidence as a whole that it was the New York proceedings and the New York jury verdict which brought about Mr Eliades' decision to close his boxing business not the freezing order.

140.   Mr Eliades told me that during the freezing order and afterwards he had to prioritise his payments and inevitably focused upon the New York proceedings. Mr Warwick submits on his behalf that, applying the generous tolerance given by the rules of mitigation (*Banco de Portugal & Waterlow & Sons Limited [1932] AC 452*) it was perfectly reasonable for him to make such a choice. The difficulty facing this submission is that it is not truly a matter of mitigation but a question of choice by Mr Eliades as to which of his debts he chose to pay first with the funds available to him. Any need to prioritise payments existed without the freezing order. It should be noted that those funds were substantially the same after the freezing order as they had been before. The £150,000 which had been spent on the New York litigation would have had to have been spent in any event, and the Managa facility was still available. Thus on the Jirov claim, and on the dependent Toney claim, Mr Eliades cannot establish that his inability to pay Mr Jirov with the potential of keeping his relationship with him extant, arose out of the freezing order. The failure to tender the sum due to Mr Jirov within a reasonable time of the fight on 1 February 2002 also constitutes a failure to mitigate. As indicated earlier in this judgment Messrs Fried and Co's letters in March and April 2002 show that payment at that time would probably have dissuaded Mr Jirov from terminating his contract with Mr Eliades.

141.   The claim for loss of profit on the 1 February 2002 fight also suffers from specific flaws as well as general causation difficulties. The claim for US $32,000 is based upon CBL's entitlement to payment for international television rights and sponsorship. Mr Eliades told me that the memorandum of understanding had been orally varied so that he was entitled to these sums in spite of what the written memorandum of understanding said. I do not accept this evidence. It was not suggested in any of Mr Eliades' witness statements and there was no evidence that such variations either existed or had been agreed to by SRLB. Mr Gotzev gave limited support for the oral variation which he said was agreed between him and SRBL but I found his evidence upon this issue unconvincing. I am satisfied that the written terms of the memorandum of understanding, rather than any oral variation to it governed the party's rights under it. It follows that Mr Eliades was not entitled to any TV money or sponsorship money.

142.   Furthermore there is no document produced in this trial indicating that any television rights were agreed or indeed even discussed. Although mention was made of Argentinian television I have seen no single piece of paper relating to it nor indeed has any evidence been given to me as to any agreement actually reached with such a company.

143.   Nor was I satisfied on the evidence that this bout in which Mr Jirov's opponent was not a serious challenger suffered any loss of ticket sales as a result of uncertainty as to whether the fight would go ahead. The evidence before me was that the majority of ticket sales take place in the last few days before the fight after the time that it was known that the fight would proceed.

144.   The alternative claim for wasted expenditure in relation to Mr Jirov also fails for the same reasons on causation. The loss of the business relationship between Mr Jirov and

Mr Eliades was not as a result of the January 2002 freezing order. It is noted in this context that when CBL consented to judgment against it in the sum of US $550,000 in the claim brought against it by Mr Jirov it did not seek to set off the 25% of the purse namely US $62,500 which CBL were entitled to deduct from his purse. Nor was the sum of US $100,000, an advance repayable by Mr Jirov deducted. Neither CBL, Mr Eliades nor the Panix companies have paid any part of this judgment to which CBL consented. The failure to make proper deductions and the failure to pay the judgment demonstrate the weakness of this claim for wasted expenditure.

145.   Mr Eliades faces different but equally difficult problems in relation to the specific claim made in relation to Travis Simms. The purse which Mr Simms required to be paid was US $2,500. His opponent's purse was US $6,500. It was clear on the evidence that Mr Eliades knew prior to the making of the freezing order that he had to get US $9,000 to Miss Stokes, Mr Simms's wife and in effect his manager, by 30 January 2002. Mr Simms wrote a letter of that date stating that the failure to pay the sum was a complete breach of contract and if the money was not paid by the evening of 30 January 2002 he would treat the contract as broken and look for another manager.

146.   In evidence Mr Simms said that he had been affected by Mr Eliades' dishonesty. He explained what he meant by that as follows:-

> "By stating that they would get the money over to me before the fight and that there was nothing to worry about, they would do everything in their efforts to get the money over to me and not to worry. When the money did not come, you know, to assure the fight, that left a very bitter taste in my mouth and that's when I made the decision that I need to move on and find someone else to work with." (Day 5 847)

He told me that after that failure he had lost trust in Mr Eliades and even if he had paid the money subsequently he would not have been prepared to have gone back to Mr Eliades.

147.   It is surprising that with knowledge that it needed to be paid Mr Eliades failed to pay such a small sum of money. I am satisfied that funds were available for him to do so both during and after the freezing order. The credit balance on the Barclay's Treptos Investments Limited account would have enabled him to discharge that sum. In fact his Amex bill showed that he spent over US $2,500 on restaurant bills and luxury items in January 2002. I reject Mr Eliades' evidence that he was focused on the consequences of the freezing order on the New York action rather than US $9,000 for Mr Travis Simms. He was fully aware of the need to pay the US $9,000 as Ms Stafford's evidence showed, and chose not to pay it.

148.   Mr Eliades was not to know at that time that Mr Simms might become, as he did, world champion and, as is submitted on Mr Lewis' behalf it appears on the facts as if he was prepared to let Mr Simms go. It is to be noted that no reference was made to Mr Simms in evidence before Mr Justice McCombe.

149.   As a matter of causation therefore the claim in respect of Mr Simms fails. Mr Eliades was not prevented by the freezing order from paying him US $9,000 but chose to do

⌀033/034

BLACKSTONE

so either because he was no longer interested in managing or promoting Mr Simms or because of the difficulties which the New York proceedings were making for him in continuing to be a manager or promoter. The failure to tender the sum of US $9,000 after 30 January 2002 was a failure to mitigate his loss.

150. The claim for damages is in any event speculative. A claim for 8 fights at considerably increased value when he had in fact only had 4 at a lesser sum is without proper basis.

151. The claim in relation to Mr Toney is also in my judgment bound to fail. It was dependent upon Mr Eliades continuing to manage or promote Mr Jirov, but the fact that he had ceased to do so, was not because of the freezing order but because of the New York proceedings and the New York jury verdict and his decision to give up boxing. Had he paid Mr Jirov's purse and continued that relationship it might have been possible, had he continued in boxing, for him to assert his rights under the future rights agreement with Mr Toney. He chose however not to pay Mr Jirov's purse.

152. It is to be noted that Mr Eliades did not list his agreements with Mr Toney in a list of assets dated 23 January 2002. He did not apparently consider that the agreement had any value.

153. Mr Warwick has submitted to me that I should approach the question of damages for future loss as set out in *Jackson v Royal Bank of Scotland plc [2005] 1 WLR 377*. He submits that various broad assumptions should be made in order to calculate what the future profit might have been. I do not consider however that such an exercise arises in this case. A chance of making future profits only arises if it can be shown that the breach of contract brought about the loss of the chance of making future profits. I am satisfied that Mr Eliades has not established that any of the claims he makes establish this essential matter of causation.

## Championship Boxing Limited

154. It is submitted on behalf of Mr Lewis that as Championship Boxing Limited are not a party to whom the undertaking was provided it cannot recover on the undertaking for any losses it sustained by reason of the January 2002 freezing order. Thus any loss in relation to Mr Simms or Mr Jirov arising out of their contracts with CBL are irrecoverable. The only basis upon which such losses might be recovered, Mr Mill submits, is if either Mr Eliades or Panix Promotions Limited was the beneficial owner of CBL in which case it might be argued that he or the company could recover its losses as a shareholder that is the diminution in the value of its shareholding in CBL if any such loss resulted from the freezing order. There is however Mr Ian Mill QC submits on behalf of Mr Lewis no such pleaded claim and it is not open for it to be advanced now.

155. Mr Warwick submits that this is a thoroughly narrow and legalistic approach wholly without merit. He submits that CBL's shares were in the name of two employees of Panix Promotions Limited on behalf of Panix Promotions Limited. CBL was the dormant company but Panix was the trading company and CBL's shares were disclosed as part of the assets of Panix Promotions Limited in its net asset statement. Others regarded the Panix companies and CBL as the same business as can be seen from Messrs Forbes Anderson's letter of 25 January 2002 and the use of

Championship Boxing Limited aka Panix Promotions in the proceedings by Mr Jirov in Arizona. It is, Mr Warwick submits, entirely normal for one company to trade and the other to hold assets such as in this case boxing contracts. He therefore invites me to regard the CBL contracts as part of the Panix business and not to adopt the stance of "legalistic purism" criticised in *Esso Petroleum Limited v Mardon [1976] 1 QB 801*. Furthermore Mr Warwick submits that as Mr Lewis obtained an injunction which expressly froze Panix Promotions Limited's business including Championship Boxing Limited the law should not allow him now to adopt a contrary position for to do so would be both to approbate and reprobate.

156. Any narrow legalistic argument which pays little or no regard to the reality of the situation is unattractive. I am not however satisfied that this is an *Esso v Mardon* situation. I found Mr Eliades' evidence about his reasons for using Championship Boxing Limited for the purposes of 'cleaner housekeeping' as unsatisfactory. I did not understand his reason for CBL being set up as a dormant company with two Panix Promotions Limited employees being the sole shareholders holding those shares on trust for either Mr Eliades or Panix but without that trust being recorded in writing.

157. This is not in my judgment a case where it would be proper for the Court to treat CBL as simply part of the Panix business rather than a separate legal entity with its own legal obligations and advantages.

158. Nevertheless CBL was treated as part of the assets of Mr Eliades or the Panix companies when the freezing order was sought and it would not be appropriate in my judgment to permit Mr Lewis to take an inconsistent attitude over the role of CBL. Were I therefore to have given judgment in favour of Mr Eliades or the Panix companies, which I have not, I would not have found that the contractual relationship between CBL and the boxers would in itself have prevented such damages to be recovered.

## Conclusion on the issue of damages.

159. Had I decided that the undertaking should be enforced I would nevertheless have held that Mr Eliades and the Panix companies have failed to establish that they have suffered any loss as a result of the freezing order. The claim for damages would therefore have been dismissed.